_____

No. 95-1794
_____

United States of America,      *
                               *
          Appellee,            *
                               *   Appeal from the United States
    v.                         *   District Court for the
                               *   Western District of Arkansas.
George David McManus,          *
                               *
          Appellant.           *
_____

        Submitted:  September 12, 1995

          Filed:  November 30, 1995
_____

Before WOLLMAN, MAGILL, and LOKEN, Circuit Judges.
_____

WOLLMAN, Circuit Judge.


     George McManus entered a conditional plea of guilty to one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922 (g)(1).  He was sentenced to 84 months' imprisonment and fined $10,000. On appeal, McManus contends that the district court[1] should have granted his motion to suppress evidence.  We affirm.


**I.**


     Because the identification number (VIN) listed on the inspection sticker on his vehicle differed from the VIN contained on the registration slip and the car itself, McManus was unable to re-register his vehicle. A difference in a VIN can occur in two situations:   (1) when a typographical error has been made or (2)

_____

[1]The Honorable Jimm Larry Hendren, United States District Judge for the Western District of Arkansas.

when the car has been stolen. When there is a problem with a VIN, licensing officials refer the matter to the state police for investigation. A form correcting the VIN is issued only after the police are satisfied that the problem is merely technical.

For the purpose of satisfying the Arkansas Department of Revenue's registration requirements, McManus went to the Arkansas State Police Headquarters in Clarksville on July 6, 1994, to verify the VIN on his vehicle. Corporal Jerry Roberts assisted McManus in performing the VIN verification. At Roberts' request, McManus produced the registration, which listed him as the owner of the vehicle. Roberts then verified that the VIN on the registration matched the VIN on the car. After verifying the match, Roberts requested McManus's driver's license for proof of identification. Roberts then ran three computer checks. First, he ran a registration check on the vehicle's VIN and on the registration itself to determine whether the vehicle was stolen. Next, he ran a driver's license check to determine whether McManus's license was current. Finally, he ran a National Crime Information Center (NCIC)[2] check to further investigate the possibility that the car was stolen, a procedure that he routinely conducted in the course of verifying a VIN even though there was no written policy requiring that that be done.

At some point during the foregoing sequence of events, McManus started to leave the station in order to retrieve additional information regarding the registration from his vehicle. Roberts, however, told him to come back in and, in McManus's words, "have a seat," with the indication, again in McManus's words, that "this wouldn't take too long." The VIN and driver's license checks

---

[2]The National Crime Information Center (NCIC) is a department within the Federal Bureau of Investigation which provides computerized information to law enforcement concerning the vehicle identification numbers of stolen vehicles, individual criminal records, and outstanding warrants.

cleared, but the NCIC search indicated that McManus was wanted for a felony probation violation. Roberts confirmed that the warrant was valid and placed McManus under arrest. During the ensuing inventory search of McManus's vehicle, police officers discovered various firearms.

McManus filed a motion to suppress, contending that he was seized in violation of the Fourth Amendment when he was asked to turn over his driver's license and told to take a seat. He also contended that the NCIC search of his criminal history violated his Fourth Amendment rights. The district court denied the motion, adopting the magistrate judge's[3] report and recommendation to that effect.

## II.

We examine the district court's denial of the motion to suppress under the clearly erroneous standard. United States v. Delaney, 52 F.3d 182, 186 (8th Cir.), cert. denied, 116 S. Ct. 209 (1995). We review de novo the underlying question of whether a seizure has occurred and whether the Fourth Amendment has been violated. Id.

McManus first argues that he was unlawfully detained by Roberts when he turned over his driver's license and was told to have a seat. The magistrate judge found that no seizure occurred because (1) the initial contact between McManus and Roberts was consensual; (2) Roberts merely requested -- rather than demanded -- the driver's license; and (3) Roberts did not use coercive tactics.

---

[3]The Honorable Beverly R. Stites, United States Magistrate Judge for the Western District of Arkansas.

Not every encounter between a law enforcement official and a citizen involves a seizure. Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). No seizure occurs when a police officer simply questions an individual or asks to see his identification, so long as the officer does not send a message that the individual must comply with his request. Florida v. Bostick, 501 U.S. 429, 434 (1991). See also United States v. McKines, 933 F.2d 1412, 1419 (8th Cir.) (en banc), cert. denied, 502 U.S. 985 (1991) (focusing on the nature of police officer's questioning to determine whether a seizure had occurred).

We consider the totality of the circumstances in determining whether "the police conduct would have communicated to a reasonable person that he was not free to decline the officer's request or otherwise terminate the encounter." United States v. Angell, 11 F.3d 806, 809 (8th Cir. 1993), cert. denied, 114 S. Ct. 2747 (1994). In United States v. Mendenhall, 446 U.S. 544, 554 (1980), the Supreme Court cited several circumstances that might evidence a seizure: "[T]he threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."

It was McManus who brought about his contact with the police. Roberts' request to see McManus's driver's license was part of the routine followed in verification situations. McManus, by his own free will, handed over his license. Roberts did not threaten McManus or use any coercive tactics. He did not display his weapon or physically detain Roberts. See United States v. Archer, 840 F.2d 567, 572 (8th Cir.), cert. denied, 488 U.S. 941 (1988) (holding that no seizure occurred when officers merely approached defendant and requested identification since officers did not use coercive tactics, display weapons, or physically restrain defendant). Roberts made a simple, good faith inquiry to ascertain

whether McManus was the owner of the vehicle, the failure to do which could well have constituted negligence in the performance of Roberts' duties.

Roberts' direction that McManus come back in and have a seat did not transform the encounter into a seizure, for McManus was not told that he could not leave the station. Admittedly, Roberts' statement could have been expressed in more precatory terms, e.g., by being prefaced with "Would you please," or some similar language. Nevertheless, we cannot conclude that a reasonable person would have felt compelled to remain in the station based on this statement. See Angell, 11 F.3d at 809-10 (stating that officer's statement to "Stay there" or "Hold it right there" did not transform a consensual encounter into a seizure). Given these circumstances, then, we hold that no seizure occurred.

### III.

McManus next asserts that Roberts violated his Fourth Amendment rights when he conducted a search of his criminal history through the use of the NCIC computer data base. To preserve the integrity and privacy of the information contained in the NCIC data base, the Federal Bureau of Investigation allows access only for criminal justice purposes, justice employment, or security clearances. United States v. Pederson, 3 F.3d 1468, 1471 (11th Cir. 1993).

Roberts clearly had a legitimate criminal justice purpose in accessing the NCIC. He stated that a discrepancy in the VIN raises a "red flag" that a car may be stolen. Thus, he automatically checks the NCIC in this type of situation. The undisputed purpose of the investigation was to verify the VIN. To do this, Roberts had to determine that the car had not been stolen.

McManus argues that once the VIN and driver's license checks cleared, Roberts had completed the investigation necessary to verify the VIN. Roberts testified, however, that a VIN check alone is insufficient to determine whether a car is stolen. For example, a car with an altered VIN would not show up as stolen in the VIN data base. Similarly, a car whose VIN has been replaced with that from a junked vehicle would not be listed. Based on his experience, Roberts believed that the NCIC check was necessary in order to thoroughly investigate the matter. By conducting an NCIC check, he could determine, for example, whether the person claiming ownership of the vehicle had a record for stealing vehicles (although it might seem counterintuitive that a person with a record of car thefts would present himself at a police station to request assistance in verifying vehicle registration, one might equally doubt that a person with an outstanding warrant for felony probation violation would do the same). Furthermore, the NCIC data base is commonly used in determining whether a car has been stolen. See United States v. Harris, 528 F.2d 1327, 1330 (8th Cir. 1975) (NCIC check justified when officer observed various scratches and marks surrounding the VIN plate on car); United States v. Lopez, 777 F.2d 543, 546-48 (10th Cir. 1985) (NCIC check warranted when out-of-state automobile was not registered in name of either passenger); United States v. Diaz-Albertini, 772 F.2d 654 (10th Cir. 1985), cert. denied, 484 U.S. 822 (1987) (NCIC check authorized when driver's license and registration did not match).

In addition, police frequently conduct NCIC checks during the course of routine investigations. See United States v. Rubio-Rivera, 917 F.2d 1271, 1276 (10th Cir. 1990) (immigration agent authorized to conduct an NCIC check as part of his normal inquiry at border checkpoint); United States v. Fernandez, 18 F.3d 874, 877-78 (10th Cir. 1994) (during course of routine traffic stop, officer may ask for a driver's license and vehicle registration, and run a computer check) (citing United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir. 1988)).

We conclude that because Roberts' inquiry was directly related to the scope of his investigation, he was justified in conducting an NCIC check. Thus, no constitutional violation occurred even if the NCIC check constituted a search within the meaning of the Fourth Amendment, a question we need not decide in this case.

The judgment is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.