UNITED STATES of America,
Plaintiff–Appellee,

v.

Terry Allen FINKE, Defendant–Appellant.

No. 95–1586.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1996.

Decided June 6, 1996.

Suzanne M. Wissmann (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

James W. Ackerman, Springfield, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, CUDAHY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

A jury convicted Terry Allen Finke of conspiracy to distribute and to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Prior to trial, Finke moved to suppress the two-and-one-half pounds of drugs found in the trunk of his rental car, claiming the search that uncovered the evidence was the result of an unreasonable detention and was without

consent. Following a hearing, the district court denied Finke's motion to suppress. He appeals his conviction based on this decision; we affirm.

## I.

On May 7, 1994 at 10:51 in the evening, Sergeant Edward Delmore of the Collinsville, Illinois Police Department pulled over a vehicle for speeding. He learned that the car was a rental car when he called in the license plate. John Walton was driving the car; Finke and Jennifer Cardinal were passengers. Before stepping out of his unmarked police car, Officer Delmore activated his audio and video equipment, thus creating a minute by minute record of the encounter.

At 10:52 John Walton exited the car and handed his license and the rental car agreement to Delmore. The agreement listed Finke as the lessor of the car and Walton as an authorized driver. The papers also indicated that the car had been rented in Evansville, Indiana on May 2, 1994. Delmore noticed that Walton's license was issued in California, and upon inquiry Walton stated that he had just gone to California with Finke and was returning for a two-week vacation. Delmore testified at the suppression hearing that he quickly became suspicious that the occupants of the vehicle were narcotics couriers. Officer Delmore had ten years of experience on the Collinsville Police Department and one year of undercover narcotics work experience with the Metropolitan Enforcement Group. The rental car concerned Delmore, as he explained that drug couriers often used rental cars to avoid asset forfeiture laws. According to Delmore, the quick, five-day round-trip across the country was also consistent with drug trafficking. In addition, Walton appeared extremely nervous.

Delmore then approached the car at 10:55 and asked Finke and Cardinal for identification. He wanted to make sure that the lessor of the car, Finke, was present and he also wanted to verify Walton's story. Delmore noted that Finke appeared to be feigning grogginess in an attempt to avoid answering questions. In addition, when Delmore flashed his light into the passenger compartment of the car, he became more suspicious that drugs were involved, as the area was cluttered with fast food wrappers and looked "like they [had] been living in [it] for the last few days." Delmore knew from his training that drug couriers frequently make straight trips because they do not want to stop anywhere with a load of drugs in their vehicle. Upon returning to his car, Delmore radioed to dispatch and requested a back-up unit for a search. He testified that he was intending to ask for consent to search the car because of his suspicions. Additionally, Delmore testified that he called for back-up for safety reasons—he had noticed that Walton was wearing a knife in a sheath. Delmore also ordered a warrant, driving status, and criminal history check on Walton, Finke, and Cardinal.

Three to four minutes later, at 10:59–11:00, Delmore was advised that all three subjects were "clear," i.e., that they possessed valid drivers licenses and were not wanted on any outstanding arrest warrants. Delmore did not return the defendants' papers and release them at this point, however, because he was still waiting for his back-up to arrive and for the criminal history check to finish. Officer Wasser arrived and was briefed by Delmore at 11:04. At 11:05 the criminal history check came through, revealing that Walton had one prior conviction for embezzlement and Finke had two prior drug convictions, one for cocaine distribution and one for a marihuana offense.

Officers Delmore and Wasser then approached Walton again, who was standing near the rear of the car. Delmore returned the rental agreement and the drivers licenses of Walton, Finke, and Cardinal to Walton. This occurred at 11:07. Delmore then told Walton that he was not going to issue him a ticket and that he was free to go. As Walton started to walk back to the car, Delmore asked him if he "had a minute." Delmore inquired whether he had any drugs or guns or anything illegal in the car, and Walton replied in the negative. Delmore then asked for permission to search the car. Walton replied, "I don't care," but after a moment said, "ask Terry." At 11:09 when Delmore

asked Finke for permission to search the car, Finke responded, "No, I don't see any reason." Delmore responded by telling Finke that he was going to call a canine unit to do a walk around the car. He then radioed for the canine unit and asked the officer to "expedite" reporting to the scene.

Delmore then resumed talking with Walton, informing him that Finke had not consented to a search so he had called a canine unit. He told Walton: "the dog is trained in narcotics and is very good. You're not under arrest or anything, but if you want the opportunity to help yourself out now is probably the time." Walton then volunteered that Finke had some pot in the car. This was at 11:10. Walton consented to a pat down search, and Delmore found a "roach clip," which is used for smoking marihuana cigarettes. At 11:12 Officer Pyles and Blitz, a german shepherd trained in drug detection, arrived on the scene.

Before Blitz began his inspection, Delmore requested that Finke and Cardinal step out of the car. This took several minutes, as they gathered their things and put on their shoes and jackets. At 11:17 Officer Pyles began walking Blitz around the exterior of the car. When Blitz reached the trunk of the car he jumped up and scratched and pawed the lid of the trunk, which indicated to Officer Pyles that Blitz smelled marihuana, cocaine, heroin, or a derivative of such. Upon a search of the trunk, the officers found a butane torch, which is frequently used to smoke crack cocaine, butane fuel, a crack pipe, an electric scale, a quantity of marihuana, and the two-and-one-half pounds of methamphetamine at issue on appeal. The officers also recovered a quantity of marihuana, a pipe, and a razor blade from Cardinal's purse. All three occupants of the car were placed under arrest.

In a motion to suppress made prior to trial, Finke argued that Delmore's extended detention of the defendants, beyond the length of time necessary for issuing a traffic citation, was an unreasonable seizure under the Fourth Amendment. The government claimed that Delmore had a reasonable suspicion at the outset of the stop that drugs were being transported and that this suspicion quickly ripened into probable cause when Walton stated that there was pot in the car. In addition, the government argued that, regardless of probable cause, Delmore had valid consent from Walton, the driver of the car, to search the car. Finke responded that Walton's consent was not binding on Finke, since Finke was the lessor of the vehicle and had specifically objected to any search. The district court denied Finke's motion, finding that Delmore's suspicions justified the detention until Delmore returned the defendants' identifications and papers and told them they were free to go, at which time the encounter became consensual. The court further found that probable cause to search was established when Walton told Delmore that there was pot in the car. Alternatively, the court found that probable cause developed when Blitz indicated that there were drugs in the trunk.

## II.

■ On appeal Finke challenges the denial of his motion to suppress, arguing again that the methamphetamine should have been excluded because the search that uncovered it was the result of an unreasonable detention and was non-consensual. We review district court determinations of reasonable suspicion and probable cause *de novo*. *Ornelas v. United States*, — U.S —, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). If Officer Delmore's continued detention of the defendant was reasonable under the Fourth Amendment, and the search was supported by probable cause, then we need not reach the issue of whether Walton's consent was valid and binding on Finke. Therefore, we begin by addressing the constitutionality of the detention and search apart from any possible consent.

■ A traffic stop is similar to an investigative detention and is thus governed by the principles set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3149–50, 82 L.Ed.2d 317 (1984); *United States v. Rivera*, 906 F.2d 319, 322 (7th Cir.1990); *United States v. Walker*, 933 F.2d 812, 815 (10th Cir.1991), *cert. denied*, 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992); *United States v.*

*Pino,* 855 F.2d 357, 362 (6th Cir.1988), *cert. denied,* 493 U.S. 1090, 110 S.Ct. 1160, 107 L.Ed.2d 1063 (1990). Under *Terry* the stop must be justified at its inception and be reasonably related in scope to the circumstances which justified the interference in the first place. *Terry,* 392 U.S. at 19, 88 S.Ct. at 1878–79; *United States v. Crain,* 33 F.3d 480, 485 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1142, 130 L.Ed.2d 1102 (1995); *Walker,* 933 F.2d at 815. The detention must be "temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983). Moreover, "the least intrusive means reasonably available to verify or dispel the officer's suspicion" must be employed. *Id.; United States v. Teslim,* 869 F.2d 316, 322 (7th Cir.1989).

On appeal Finke does not argue that the initial stop of the car for speeding was unconstitutional.[1] He also apparently does not question any of the events taking place between 10:52 and 10:59. During this time, Delmore had obtained the rental agreement and drivers licenses from all three occupants of the car, had inspected the car and observed its cluttered condition, had noticed Finke's attempt to feign grogginess, and had engaged Walton in a short discussion, which revealed both his nervousness and the fact that the car had been to California and back in five days. Delmore had also radioed for back-up for search and safety purposes, in addition to requesting a warrant and criminal history check. Finke claims that the detention first became unreasonable at 10:59, when Delmore decided to wait for the criminal history check results, even though he had just received word from dispatch that the occupants of the car had valid drivers licenses and were not wanted on any outstanding warrants.

■ We do not believe that Finke's Fourth Amendment rights were infringed when Delmore decided to wait five minutes for the results of the criminal history check he had requested. We note that there is little authority addressing when and under what circumstances a criminal history check is permissible during a routine traffic stop. Recently, the Tenth Circuit indicated that for officer safety reasons such a check would be an unobjectionable part of every routine traffic stop:

> [Criminal history] checks are run largely to protect the officer. Considering the tragedy of the many officers who are shot during routine traffic stops each year, the almost simultaneous computer check of a person's criminal record, along with his or her license and registration, is reasonable and hardly intrusive.

*United States v. McRae,* 81 F.3d 1528, n. 6 (10th Cir.1996). Other cases demonstrate an implied acceptance of criminal history checks as generally reasonable, by beginning their unconstitutional detention analysis only after the point at which a criminal history report has been obtained. For example, in *Crain,* 33 F.3d at 483, the Fifth Circuit held that it was not an unreasonable or illegal detention to question the driver and passengers of a car about matters unrelated to the traffic stop while the officers were waiting for the results of a computer check, including a criminal history search. This, of course, assumes that it was reasonable to ask for the criminal history check and to extend the detention until it was received. *See also United States v. Sandoval,* 29 F.3d 537, 538, 542–43 (10th Cir.1994) (finding criminal history report of drug arrest, standing alone, insufficient to extend traffic stop, but not questioning NCIC[2] request producing criminal record); *McManus,* 70 F.3d at 993 (approvingly noting use of NCIC criminal history check in routine traffic stops to support using of same check in VIN identification investigation).

---

**1.** Finke did argue below that the stop was pretextual. However, the district court rejected this argument under the reasoning of *United States v. Trigg,* 878 F.2d 1037 (7th Cir.1989), *cert. denied,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991), and Finke does not make this argument on appeal.

**2.** The National Crime Information Center (NCIC) provides computerized information to law enforcement concerning outstanding warrants, individual criminal records, and vehicle identification numbers (VIN numbers) of stolen vehicles. *United States v. McManus,* 70 F.3d 990, 991 n. 2 (8th Cir.1995).

Thus there is some support for the argument that requesting a criminal history check is a reasonable, constitutional part of all or most traffic stops. We find such a bright line rule troubling, however, because often criminal history checks take longer to process than the usual license and warrant requests, and after a certain point meaningful additional time could, we believe, constitute an unreasonable detention of the average traveller. Unless technology permits criminal record requests to be conducted reasonably contemporaneously with the license and warrant checks normally solicited, we are reluctant to say such checks are always reasonable or justified in the average traffic stop.

■ To decide this case, however, we need not adopt or reject any talismanic rule regarding the propriety of criminal history checks during routine traffic detentions, as it quickly became clear to Officer Delmore that this was not an average stop. Delmore was immediately confronted with suspicious behavior and circumstances—conduct consistent with drug trafficking. By the time Officer Delmore called in the criminal history check, we believe he had sufficient reasonable and articulable suspicions of drug courier activity to justify a speedy, unintrusive criminal record inquiry in addition to a warrant and license check. *See Rivera*, 906 F.2d at 322 (reasonable suspicions warranted limited questioning outside the scope of traffic related investigation); *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir.1993) (if circumstances "give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions"); *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir.1990) (reasonable suspicions of drug activity provides "justification for a greater intrusion unrelated to the traffic offense"), *cert. denied*, 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991); *United States v. Jones*, 44 F.3d 860, 872 (10th Cir.1995) (subsequent detention justified during traffic stop if reasonable suspicion of illegal drug activity). In forming his suspicions, Delmore was entitled to assess the circumstances and the defendants' behavior in light of his experience as a police officer and his knowledge of drug courier activity. *Teslim*, 869 F.2d at 322. He articulated several specific factors which contributed to his reasonable suspicion: 1) the car was a rental; 2) it had been driven to California and back in five days; 3) the passenger compartment appeared as if they had been living in it, i.e., making a straight trip without stopping; 4) Walton was extremely nervous; and 5) Finke appeared to be feigning grogginess in an attempt to avoid answering questions. While there may be an innocent explanation for each of these factors taken separately, viewing the circumstances in combination, we believe they constitute enough reasonable suspicion of drug activity to warrant an unintrusive criminal history check. *See United States v. Sokolow*, 490 U.S. 1, 9, 109 S.Ct. 1581, 1586–87, 104 L.Ed.2d 1 (1989) (each factor standing alone insufficient, but "taken together they amount to reasonable suspicion"); *Teslim*, 869 F.2d at 322 (must look to totality of the circumstances in analyzing reasonable suspicion). Significant to our conclusion are the facts that the request took only five extra minutes and involved no additional questioning, no action on the part of the defendants, and no request or wait for a canine unit. The criminal history request was the least infringing way for Delmore to quickly confirm or dispel his building suspicions and to determine whether continued inquiry or detention was justified. *See Royer*, 460 U.S. at 500, 103 S.Ct. at 1325–26; *Teslim*, 869 F.2d at 322.

■ In addition, officer safety concerns are legitimately heightened when suspicious activity is detected, and these concerns further warranted the record check in this case, especially since Walton was wearing a sheath containing a knife. The results of a criminal history check could indicate whether further back-up or other safety precautions were necessary. Balancing the nature and quality of the intrusion on Finke's Fourth Amendment interest (waiting for a quick, unintrusive record check) against the importance of the governmental interests justifying the intrusion (detecting and preventing criminal activity, as well as safety concerns), *see United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642–43, 77 L.Ed.2d 110 (1983), we find that Delmore's decision to request and wait for the criminal history check was not unreasonable. Delmore's reasonable sus-

picions of drug trafficking at the time and legitimate safety concerns supported the brief detention of limited scope.

Alternatively, Finke argues that the detention became unreasonable when Delmore radioed for the canine unit and continued to question Walton, after Finke denied consent to search the car. Upon receiving the criminal history report, which revealed that Walton had a previous conviction for embezzlement and Finke had two previous drug convictions, Delmore approached Walton again, returned all of the documentation he possessed, and told Walton he was free to go. He then asked him if he had any drugs in the car and if he could conduct a search. Walton agreed, but told Delmore to "ask Terry." When Delmore sought Finke's permission, Finke denied consent. Delmore responded by informing Finke that he was calling a canine unit and returned to continue his discussion with Walton.

■ The government would like to characterize the overall encounter as consensual at this point, and thus no longer a seizure within the purview of Fourth Amendment analysis. *See United States v. Williams*, 945 F.2d 192, 195 (7th Cir.1991). If the overall encounter was consensual, the Fourth Amendment would not prohibit Delmore from asking questions unrelated to the traffic stop or from inquiring if the occupants would agree to wait for a canine unit, even if there was no reasonable suspicion of criminal activity. *Id.* at 195–196; *Walker*, 933 F.2d at 817. We might have agreed with the government's consensual characterization if Finke was challenging the initial questioning of Walton, as at that point Delmore had just returned all of the documentation he had received from the occupants and had told Walton he was free to go. He then asked Walton "if he had a minute" before bringing up the transporting of drugs and the search. *See Rivera*,

906 F.2d at 323; *Walker*, 933 F.2d at 817. Any consensual dimension to the encounter was fleeting, however, as Delmore quickly revoked the freedom to leave that he had just conferred, by telling Finke he was calling the canine unit. The retention or return of documentation is not dispositive; rather, the question must be whether "a reasonable person would have believed he was free to go." *Rivera*, 906 F.2d at 323; (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)); *see also Williams*, 945 F.2d at 196. We do not believe a person in Finke's position, who had just been told that a canine unit was being called, would feel free to get behind the wheel and drive away from the scene. Delmore certainly did not ask Finke if he would be willing to wait for the canine unit; in fact there was no question at all, only a statement that the canine unit was being summoned. Further, it is not clear whether Finke was even aware that Delmore had returned the licenses and rental agreement to Walton and told Walton they were free to leave, as Finke was in the car when that conversation transpired.

■ We find, however, that Delmore was warranted in detaining the defendants while waiting for the canine unit and in questioning Walton, because at this point Delmore had developed further and stronger reasonable suspicion that the vehicle was transporting drugs. This suspicion warranted the more intrusive measures of calling in the canine unit and questioning Walton directly about carrying contraband.[3] *See United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir.1994) (en banc) (reasonable articulable suspicion that vehicle is carrying contraband sufficient to justify detention until canine unit arrived), *cert. denied*, —— U.S. ——, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995); *United States v.*

---

**3.** This fact distinguishes this case from the two cases Finke cites in support of his argument— *United States v. Walker*, 933 F.2d 812 (10th Cir. 1991), *cert. denied*, 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992) and *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988). In those cases, the Tenth Circuit found that the detention of the defendants for further questioning unrelated to the traffic stop was unreasonable under the Fourth Amendment. The court

also determined in both cases, however, that there was no reasonable suspicion of any illegal activity. *See Guzman*, 864 F.2d at 1520 ("nothing [the officer] learned during his investigation created reasonable suspicion to justify [further] detention"); *Walker*, 933 F.2d at 816 ("[the officer] gave no testimony indicating that he suspected that the defendant was involved in any criminal activity").

*White,* 42 F.3d 457, 460 (8th Cir.1994) (same); *United States v. Pino,* 855 F.2d 357, 363 (6th Cir.1988) (reasonable suspicion that defendants were transporting drugs supported questioning and request to consent to search of vehicle stopped for traffic violation), *cert. denied,* 493 U.S. 1090, 110 S.Ct. 1160, 107 L.Ed.2d 1063 (1990). In addition to the suspicious behavior and circumstances which justified the criminal history check, Delmore had knowledge of Finke's two prior drug convictions. The record check strongly confirmed Delmore's initial suspicions. Under the totality of the circumstances (the drug convictions combined with the other indicators of drug courier activity), *see Teslim,* 869 F.2d at 322, we conclude Delmore possessed sufficient reasonable suspicion to call for the canine unit, continue to question Walton regarding the transport of contraband, and to hold the defendants the four minutes until Blitz arrived.[4] The detention of the defendants in duration and scope was reasonable and within constitutional bounds.

■ Delmore's reasonable suspicions then quickly blossomed into probable cause to search the vehicle. While waiting for the canine unit, Delmore engaged Walton in conversation, explaining that Finke had not consented to the search and that the drug detecting dog was en route. Walton then admitted that there was "pot" in the car, and a pat down search of Walton uncovered a roach clip. Less than three minutes later, Blitz entered the scene and indicated to the officers that there were drugs in the trunk of the vehicle. There was clearly probable cause at this point to search the car, *see United States v. Patterson,* 65 F.3d 68, 71 (7th Cir.1995) (drug dog alert combined with other suspicious circumstances provided probable cause to search vehicle), *cert. denied,* —— U.S. ——, 116 S.Ct. 740,

133 L.Ed.2d 689 (1996); *Bloomfield,* 40 F.3d at 919 (dog identification of drugs provides probable cause); *United States v. Morales–Zamora,* 914 F.2d 200, 205 (10th Cir.1990) (same), and a warrant was not required under the automobile exception. *Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419 (1969). Thus, the two-and-one-half pounds of methamphetamine uncovered was the result of a constitutional detention and search, and the district court did not err in refusing to suppress the evidence. Given this conclusion we need not reach the issue of the scope and validity of Walton's consent.

For the foregoing reasons, Finke's conviction is

AFFIRMED.

---

**4.** Other courts have found sufficient reasonable suspicion of drug activity to support further questioning and the calling of a canine unit based on similar factors and circumstances. *See, e.g., Bloomfield,* 40 F.3d at 919 (nervousness, strong "masking odor," and pager); *Pino,* 855 F.2d at 363 (inconsistent answers and characteristics of drug courier profile); *McRae,* 81 F.3d 1528, 1996 WL 191593 (suspicious travel plans in rental car, prior drug convictions, and defendant's "intense" watching of officer); *United*

*States v. Kopp,* 45 F.3d 1450, 1453 (10th Cir.) (suspicious travel plans, inconsistent answers, and nervousness), *cert. denied,* —— U.S. ——, 115 S.Ct. 1721, 131 L.Ed.2d 579 (1995); *White,* 42 F.3d at 460 (nervousness, no address for delivering blankets supposedly transporting, radar detector and ham radio in car, and traveling to and from drug source cities); *Barahona,* 990 F.2d 412, 416 (8th Cir.1993) (inability to verify license, car rented in another name, and quick round-trip from California to St. Louis).