UNITED STATES of America

v.

Eliseo Medina DIMAS, Defendant.

No. CRIM. 2:04–CR–136.

United States District Court,
W.D. Pennsylvania.

Aug. 11, 2005.

Almon S. Burke, Jr., United States Attorney's Office, Pittsburgh, PA, for United States of America.

Marketa Sims, Federal Public Defender's Office, Pittsburgh, PA, for Eliseo Medina Dimas.

### OPINION

HARDIMAN, District Judge.

On June 8, 2004, a grand jury returned a one-count indictment charging Defendant Eliseo Medina Dimas (Dimas) with transportation of illegal aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and 1324(a)(1)(B)(i).

Presently before the Court is Defendant's Motion to Suppress, in which he argues: (1) that the Pennsylvania State

Trooper who stopped his vehicle on May 4, 2004 lacked probable cause or even reasonable suspicion to believe that Dimas was violating the law; (2) that he was arrested without probable cause; (3) that he was not properly administered warnings under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and (4) that his post-arrest statements were the product of coercion and unreasonable delay in presenting him to a magistrate and obtaining a probable cause determination. Accordingly, Defendants seek to suppress all statements and evidence obtained as a result of Dimas' arrest and subsequent interrogation. This Court heard testimony on Defendant's motion on January 24, 2005, at which the following three witnesses testified: Corporal Kevin Jaszemski of the Pennsylvania State Police, Special Agent Donald Byers of United States Immigration and Customs Enforcement (USICE), and Defendant Dimas.

## I. Findings of Fact

At approximately 6:00 p.m. on Tuesday, May 4, 2004, Corporal Kevin Jaszemski (Jaszemski) of the Pennsylvania State Police was traveling eastbound in a marked patrol car on Interstate 80 in Mercer County. Jaszemski observed a series of vehicles moving from the right-hand lane and going into the left-hand lane to pass a slower moving vehicle. Jaszemski approached and discovered that the slow-moving vehicle was a large 15–passenger Chevrolet van bearing a California license plate, which he estimated was traveling approximately ten miles per hour slower than the posted speed limit of 65 miles per hour. As Corporal Jaszemski continued to follow about 30 to 40 yards behind the van, he observed it drive onto the right-hand

berm of the highway three times over the course of approximately a half a mile, or about thirty seconds of driving time. Jaszemski described the van's movement as a "gradual drift" in which the van would move around two feet onto the berm before returning to the road. Based on his training and experience, Jaszemski was concerned that the driver of the van might be under the influence of alcohol or a controlled substance, fatigued, medically ill, or "possibly just a bad driver." Accordingly, he activated his patrol car's emergency lights and initiated a traffic stop of the van "for the safety of the operator of [the van] and the other motoring public." Corporal Jaszemski also testified that he was concerned the driver had violated Pennsylvania Vehicle Code Section 3309(1),[1] which he believed requires a motorist to drive a vehicle within one lane of traffic and prohibits a vehicle from drifting onto the berm of the highway.

Within a reasonable time after he activated his emergency lights, the van pulled over and Corporal Jaszemski approached the vehicle on the driver's side and requested the driver's license and registration. Corporal Jaszemski testified that the driver, whom Jaszemksi identified at the suppression hearing as the Defendant, was a Hispanic male and did not smell of alcohol or otherwise appear intoxicated. Dimas produced a license identifying himself as Eliseo Medina Dimas of Los Angeles, California. He also produced a California vehicle registration indicating that the van was owned by Martin Madrigal. Corporal Jaszemski then looked into the van and observed approximately 16 people, including Dimas. From what Jaszemski could see, the passengers appeared to be

---

1. This provision reads:
 (1) Driving within a single lane—A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made safely.
 75 Pa.C.S. § 3309(1).

white Hispanic men and women. He also noticed an odor coming from the van which smelled "like a lot of people had been in the van for a long—several days." There was no luggage on the top of the van, and Jaszemski observed no luggage within the van.

Corporal Jaszemski explained to Dimas that he was concerned about his driving and asked whether he was feeling tired. Dimas responded negatively in broken English, and Jaszemski then asked Dimas to exit the vehicle and accompany him to the rear of the van. Dimas complied and walked to the rear of the van without stumbling or exhibiting any signs of intoxication. Jaszemski then asked him about his origin and destination. Dimas stated, again in English, that the group was traveling from Los Angeles to New York. Corporal Jaszemski also asked the identities of the others in the van and Dimas replied that they were friends. Jaszemski then asked whether the occupants of the vehicle were in the country legally. Jaszemski testified that he asked this question because he had been involved with very similar incidents in which large vans had been intercepted on Interstate 80 carrying illegal immigrants from the western half of the United States to the New York area, and that it was common knowledge among Pennsylvania State Police troopers that Interstate 80 was a corridor for illegal immigrant trafficking to New York City. That the van was a large capacity vehicle coming from California, owned by an individual who was apparently not in the van, filled to capacity but with little if any luggage, and smelling as if the passengers had been in the vehicle for several days, caused Corporal Jaszemski to suspect that the van was involved in transporting illegal immigrants.

In response to Jaszemski's question regarding the legal status of the passengers in the van, Dimas responded that he did not understand the question and broke eye contact. Jaszemski repeated the question and received the same response. Jaszemski then spoke with two of the passengers who spoke English. The first passenger stated the group was traveling to New York to find work, but also maintained that he did not understand Jaszemski's question regarding the immigration status of the passengers. The second passenger stated that he had lived in California for the past 15 years and that the group was traveling to New York to visit relatives. Corporal Jaszemski then returned to his patrol car and radioed the state police barracks at Mercer, requesting information on the criminal record and immigration status of the Defendant and the two passengers with whom he had spoken. During the course of the next thirty to forty-five minutes, the barracks informed Jaszemski that Dimas was a legal permanent resident, but that one of the passengers was not lawfully in the country. Jaszemski then requested that the Defendant drive the van to the police barracks, where it was determined that all fifteen of the passengers were illegal aliens. Jaszemski testified that he had no further contact with Dimas at the barracks.

Special Agent Todd Burns of United States Immigration and Customs Enforcement (USICE) arrived at the Mercer police barracks at approximately 9:30 p.m. that evening and took the Defendant and his passengers into administrative custody. Dimas testified that Burns began interrogating him in Spanish at the Mercer barracks and did so without providing any form of *Miranda* warnings. Dimas maintains that Burns used highly abusive language and demanded he confess that he had brought the passengers from Mexico to the United States. After taking photographs and fingerprints of all the van's occupants, Burns handcuffed Dimas and three passengers and transported them to the USICE office in Pittsburgh. The US-

ICE interview log indicates that Dimas arrived in Pittsburgh between 3:00 and 4:00 a.m. on May 5, 2004. Dimas testified that he slept on an iron bench in a holding cell.

Special Agent Burns, accompanied by Special Agent Donald Byers, interrogated Dimas at approximately 8:15 a.m. Special Agent Byers testified that he personally observed Dimas hear his rights read to him over the phone in Spanish by an interpreter in New York. Indeed, Dimas signed a form, which contains his *Miranda* rights in Spanish, acknowledging waiver of those rights at 5:27 a.m. and 8:15 a.m. Special Agent Burns questioned Dimas through the interpreter and in the presence of Agent Byers for approximately twenty minutes, writing each question and answer down in English. At the end of the session, the interpreter then translated each question and answer for Dimas and he was permitted to make some changes. Dimas then signed a form, also translated into Spanish by the interpreter, indicating that the statement was a true and complete record of his interrogation. Special Agent Burns then transported Dimas to a Magistrate Judge in Pittsburgh, where he was arraigned at approximately 3:00 p.m.

## II. Discussion

### A. The Initial Traffic Stop

A traffic stop of a vehicle and the detention of its occupants is a "seizure" under the Fourth Amendment, "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The decision to stop an automobile when the police have probable cause to believe that a traffic violation has occurred is reasonable. *Whren*, 517 U.S. at 810, 116 S.Ct. 1769; *United States v. Johnson*, 63 F.3d 242 (3d Cir.1995)(at a minimum, police cannot make a traffic stop without "reasonable

suspicion, based on articulable facts, that a traffic violation has occurred").

In this case, the Government argues that the slower speed of the van and its repeated movement on and off the berm of the roadway gave Corporal Jaszemski reasonable suspicion that the driver had violated 75 Pa.C.S. § 3309(1) or that he was intoxicated or too tired to safely operate a vehicle upon a public roadway, which it submits are violations of the Pennsylvania Vehicle Code. In response, Dimas cites *Commonwealth v. Gleason*, 567 Pa. 111, 785 A.2d 983 (2001) and subsequent cases in which the Pennsylvania courts held that erratic driving, without more, does not provide probable cause to initiate a traffic stop for violation of Section 3309(1) or any other provision of the vehicle code, such as driving while intoxicated or tired.

Dimas' reliance upon *Gleason* and its progeny is misplaced. It is well-settled that evidence seized by state officers in violation of state law is admissible so long as the same search, if conducted by federal officers, would have complied with the Fourth Amendment. *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). In *Elkins*, the Supreme Court of the United States wrote:

[E]vidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial. In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an *independent inquiry*, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state

court may have countenanced, nor *diminished by what another may have colorably suppressed.*

364 U.S. at 223–224, 80 S.Ct. 1437 (emphasis added). *See also United States v. Rickus,* 737 F.2d 360, 363 (3d Cir.1984)("It is a general rule that federal district courts will decide evidence questions in federal criminal cases on the basis of federal, rather than state, law.") Thus, this Court is not bound by what a Pennsylvania court would have done under its own law and precedent, but rather must conduct its own independent analysis to determine whether Corporal Jaszemski's actions complied with federal law.

■ Proceeding to this independent analysis, the Court concludes that the facts known to Corporal Jaszemski at the time of the stop provided probable cause to believe that Dimas was under the influence of an intoxicating beverage or a controlled substance, in violation of the Pennsylvania Vehicle Code, *see* 75 Pa.C.S. § 3802. Dimas weaved on and off the berm of a busy highway several times over the course of thirty seconds. Although it is true that the average motorist may momentarily drift in and out of a traffic lane from time to time (perhaps while adjusting the radio or glancing at a road map), Dimas' movements were of a different order. His vehicle drifted a full two feet on to the right-hand berm, and did so two more times over the brief period Corporal Jaszemski observed the vehicle. A reasonable observer would conclude that such repeated deviations were more likely caused by serious impairment or exhaustion rather than momentary distraction. The relatively slow speed of Dimas' vehicle reinforces this conclusion. Corporal Jaszemski's concern was therefore justified, and the subsequent traffic stop was proper.

Although the parties do not cite—and the Court has not found—controlling precedent of the Court of Appeals for the Third Circuit, the Court's conclusion is consistent with the weight of authority from other courts of appeals. *See Gaddis v. Redford Twp.,* 364 F.3d 763 (6th Cir. 2004) (upholding stop of motorist who twice touched the center divider line over several hundred feet of road); *United States v. Ozbirn,* 189 F.3d 1194 (10th Cir. 1999) (upholding stop of motor home which twice drifted onto shoulder of interstate highway over a quarter mile stretch of road); *United States v. Palomino,* 100 F.3d 446 (6th Cir.1996) (upholding stop of motorist who drove 10–15 miles per hour below speed limit, crossed two lanes of traffic without signal, and weaved in and out of right-hand emergency lane); *United States v. Barahona,* 990 F.2d 412 (8th Cir.1993) (upholding stop of motorist who moved partially onto shoulder and back and failed to use signals when changing lane); *United States v. Harris,* 928 F.2d 1113 (11th Cir.1991) (upholding stop of motorist who twice weaved into emergency lane on a one-mile stretch of road).

The *Harris* and *Ozbirn* cases are particularly relevant as both involved vehicles repeatedly moving on and off the right-hand berm over a short stretch of road, just as Dimas did in this case. Furthermore, *Ozbirn* involved a Kansas statute strikingly similar to one of the Pennsylvania statutes at issue here. There, the government argued that the defendant's repeated drifting into the right-hand emergency lane justified a stop for violating a Kansas statute providing that a vehicle "shall be driven as nearly as practicable entirely within a single lane." *Ozbirn,* 189 F.3d at 1198 (citing Kan Stat. Ann. § 8–1522). *Cf.* 75 Pa.C.S. § 3309(1) ("A vehicle shall be driven as nearly as practicable entirely within a single lane."). The Court of Appeals for the Tenth Circuit agreed that the defendant had violated the Kansas statute, but held in the alternative that, even if the officer did not have probable

cause under that specific statute, the defendant's behavior also justified an investigatory stop for driving while intoxicated. *Id.* at 1199. In the instant case, there is some question as to whether the Defendant's behavior violated Section 3309(1), *see Commonwealth v. Malone,* 1993 WL 733131, 19 Pa. D. & C.4th 41 (1993) ("Section 3309(1) does not require perfect adherence to driving entirely within a single marked lane on all occasions."). Nevertheless, the application of § 3309 is not dispositive as Dimas' behavior clearly justified Corporal Jaszemski's concern that he was driving while intoxicated in violation of Pennsylvania law.

Finally, the appellate decisions invalidating traffic stops for erratic driving onto the right-hand berm or shoulder are distinguishable from this case. In *United States v. Gregory,* 79 F.3d 973 (10th Cir. 1996) and *United States v. Freeman,* 209 F.3d 464 (6th Cir.2000), the defendants had moved into the emergency lane only once, and the defendant in *Gregory* was driving on a winding stretch of mountain highway on a windy day. *See Gaddis,* 364 F.3d at 771 (distinguishing *Freeman* based on only one swerve into emergency lane); *Ozbirn,* 189 F.3d at 1198 (distinguishing *Gregory* based on only one swerve and adverse weather conditions). In the case at bar, the Defendant crossed the bermline three times on a straight stretch of interstate highway, and there was no indication of adverse weather conditions. These facts place this case squarely among the precedents where probable cause was found. Accordingly, Corporal Jaszemski's traffic stop did not violate Dimas' rights under the Fourth Amendment.

*B. Initial Questioning .*

 A valid traffic stop becomes unreasonable when its scope exceeds the justification for its initiation. *Illinois v. Caballes,* 543 U.S. 405, 408, 125 S.Ct. 834, 837, 160 L.Ed.2d 842 (2005). "An investi-

gative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). During the course of a traffic stop, an officer may ask the driver for license and registration, request that the driver and occupants of the car exit the vehicle, and ask the driver and passengers about their destination and purpose. *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 n. 6 (1977); *Maryland v. Wilson,* 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *United States v. Givan,* 320 F.3d 452, 459 (3d Cir.2003); *United States v. Bloomfield,* 40 F.3d 910 (8th Cir.1994); *United States v. Dewitt,* 946 F.2d 1497 (10th Cir.1991); *United States v. Finke,* 85 F.3d 1275 (7th Cir.1996); *United States v. Erwin,* 155 F.3d 818 (6th Cir.1998). When there is no further justification for the stop, it should end. *United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

 However, when an officer "develops a reasonable, articulable suspicion of criminal activity," he may "expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *Givan,* 320 F.3d at 458. The officer must only "articulate some minimal, objective justification for an investigatory stop." *Id.* In determining whether there was reasonable suspicion, a court "must consider the totality of the circumstances, in light of the officer's experience." *Id.* The court should "accord great deference to the officer's knowledge of the nature and nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis." *Id.* Finally, in determining whether a detention is too long for an investigatory stop, it is "appropriate to

examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

Dimas argues that Corporal Jaszemski's stop went well beyond the scope and time needed to determine if he was intoxicated and to issue a warning or citation for a Vehicle Code violation. He also argues that Jaszemski relied only upon the fact that the occupants of the van were Hispanic and Dimas' failure to maintain eye contact when questioned about the passengers' immigration status. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. De la Cruz–Tapia*, 162 F.3d 1275 (10th Cir.1998).

■ Defendant's arguments ignore a number of other observations made by Corporal Jaszemski over the course of the stop that provided reasonable suspicion of illegal activity. While asking Dimas for license and registration and explaining his concern that he was driving while intoxicated or tired, all of which was well within the bounds of a normal traffic stop, Jaszemski observed that there was no luggage either in the van or on top of it, despite the fact that the van appeared to be filled to capacity. He also noted that the driver's license did not match the registration, and that there was an odor emanating from the van, as if its occupants had been there for several days. Corporal Jaszemski then asked Dimas to exit the vehicle and asked him his origin, destination, and purpose, all of which was again well within the scope of a normal traffic stop. Dimas replied that they were a group of friends traveling from Los Angeles to New York. Thus, while doing nothing beyond the scope of a valid traffic stop, Corporal Jaszemski learned that the driver did not own the

vehicle, the vehicle was filled to capacity with individuals who were not carrying the luggage one would expect for a cross-county trip, and that it was emanating an odor that suggested the passengers had been in the van for days. These circumstances, considered in their totality and coupled with Jaszemski's prior experience with incidents of illegal immigrant smuggling and his awareness that Interstate 80 was a common road used by illegal immigrants going to New York City from the western half of the United States, gave Jaszemski "reasonable, articulable suspicion" that Dimas was involved in transporting illegal immigrants. His subsequent questioning of Dimas and other passengers regarding their immigration status, and his request that the Mercer barracks run a computer check on their immigration records, were therefore reasonable.

Finally, the record suggests that Corporal Jaszemski "diligently pursued a means of investigation that was likely to confirm or dispel" his initial suspicions. *Sharpe*, 470 U.S. at 686, 105 S.Ct. 1568. The first response from the National Law Enforcement Telecommunications System (NLETS), regarding only Dimas' operator status and criminal record, was received at 6:18 p.m. This suggests that Corporal Jaszemski began running a records check on the information provided by Dimas and the two other passengers approximately 15 minutes after initiating the traffic stop. NLETS records also indicate that individual queries regarding the immigration status were run on the suspects at 6:48 p.m., 6:49 p.m., and 6:51 p.m., and responses were received at 6:59 p.m., 7:01 p.m., and 7:02 p.m., respectively. Dimas makes much of the fact that he was held a full 40–45 minutes after Corporal Jaszemksi had received the initial NLETS response indicating no criminal record or outstanding warrants. Yet Corporal Jaszemski testified that criminal record inquiries are typi-

cally returned very quickly, while immigration inquiries can take "up to half an hour." Thus, the significant time between Corporal Jaszemski's initiation of the record check with the Mercer barracks and the final response from NLETS regarding immigration status hardly demonstrates an unreasonable delay on Corporal Jaszemski's part.

## C. Probable Cause to Arrest

■ Both sides agree that Corporal Jaszemski's request that Dimas drive the van and its passengers to the Mercer barracks was an arrest. Yet the Defendant argues that Jaszemski did not have probable cause to believe that Dimas was engaged in knowingly transporting illegal immigrants, as the NLETS inquiry indicated that only one of the passengers was an illegal alien and he had no information regarding the immigration status of the other thirteen occupants of the van. Defendant implicitly suggests that Corporal Jaszemski was required to run NLETS inquiries upon all or substantially all the vehicle's occupants before initiating an arrest. However, such a contention would hardly be based upon " 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (discussing the probable cause standard) (internal citations omitted). In addition to the factors which, in his experience, initially suggested the possibility of illegal immigrant trafficking, Corporal Jaszemski learned that at least one passenger was a confirmed illegal alien. Also, two passengers had given inconsistent explanations as to the identity and purpose of the group, one saying that they were going to visit relatives and another that they were going to New York to find work. Dimas had earlier said they were all "friends" going to New York, and did not state a purpose. Had a clear and consistent identity and purpose been articulated, then perhaps the presence of one illegal alien in the van would not have been an indication of criminal conduct. Yet everything Corporal Jaszemksi observed and learned over the course of the stop reasonably suggested that this was likely a group of strangers, many or most of whom were not legally in the country, traveling from the western half of the United States to New York on a route that was commonly used to transport illegal immigrants to New York City. A reasonable and prudent observer would conclude that Corporal Jaszemksi was well-supported by "the factual and practical considerations of everyday life."

## D. Dimas' Statements to Corporal Jaszemski

Dimas argues that his initial statements to Corporal Jaszemski should be suppressed, as he was not given *Miranda* warnings before he was asked about the immigration status of the passengers. This argument is precluded by *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), in which the Supreme Court held that roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute "custodial interrogation" for the purposes of the *Miranda* rule. Had Corporal Jaszemski ordered Dimas into the squad car or otherwise placed him in a more coercive environment, this would be a closer question. But requesting a driver to simply exit the vehicle and walk to the rear is no more coercive than the average traffic stop addressed in *Berkemer*.

## E. Interrogation at USICE Pittsburgh

Dimas asserts three arguments regarding his interrogation at USICE Pittsburgh. First, he alleges that he was not properly informed of his right to appointed

counsel and did not properly waive that right. Second, he argues that Agent Burns' interrogation was so inherently coercive that his alleged waiver of *Miranda* rights was not knowing and voluntary. Alternatively, he argues that even if the waiver was voluntary, the statement should be suppressed because the Government unreasonably delayed his presentment to a magistrate for a probable cause hearing, Finally, he argues that the Government has failed to establish the accuracy of the English translation of his interrogation.

■ Dimas' first argument is contrary to the record in two important ways. First, the Government has introduced a form containing the *Miranda* warnings in Spanish and a statement, signed by Dimas, acknowledging that he received these warnings. At the suppression hearing, Dimas himself acknowledged having the warning read to him over the phone in Spanish. Second, Dimas' testimony concerning his understanding of the *Miranda* warnings lacks credibility. He testified unequivocally that he understood other concepts contained in the *Miranda* warning, such as the right to remain silent, the right to a lawyer, and that anything he said could be used against him in a court of law. Yet he claims not to have understood the right to *appointed* counsel, despite the fact that this is contained within the same *Miranda* warning. This inconsistent and self-serving testimony defies credulity, and the Court finds that Dimas was in fact informed of his right to appointed counsel and understood that right.

With regard to the voluntariness of his waiver of *Miranda* rights, Dimas points to the intimidating manner in which Agent Burns allegedly conducted interrogations at the Mercer barracks, and the fact that

he had been up for 24 hours without food or water when he was interrogated at US-ICE Pittsburgh. Yet this argument founders upon his own testimony under cross-examination:

Q. So when you were in the immigration building[USICE Pittsburgh] you were not intimidated?

A. No, when we were at the police[Mercer barracks] is where he was intimidating me through swearing.

Q. I see. So you felt intimidated while you were at the barracks at the state police, is that correct?

A. Yes.

Q. But once you reached the INS headquarters or the INS building you were not intimidated, is that correct?

A. Correct.

Given Dimas' own testimony that he was not intimidated at the USICE Pittsburgh office, this Court cannot hold that his waiver of *Miranda* rights was coerced.

■ Dimas' argument regarding the Government's delay in presenting him to a magistrate for a probable cause hearing is similarly unavailing. Dimas relies heavily upon *United States v. Superville*, 40 F.Supp.2d 672 (D.Virgin Islands 1999), in which the court held that a voluntary confession extracted beyond the six-hour safe harbor contained in 18 U.S.C. § 3501(c)[2] may be suppressed based upon unreasonable delay in presenting the defendant before a magistrate. Yet as the Defendant acknowledges, *Superville* is plainly contrary to *Virgin Islands v. Gereau*, 502 F.2d 914 (3d Cir.1974), in which the Court of Appeals for the Third Circuit held that delay is but one factor in determining the voluntariness of a confession and is not an independent basis for suppression. As dis-

**2.** Section 3501(c) states that a confession "made or given by such person [defendant] within six hours immediately following his arrest or detention" should not be suppressed "solely because of delay in bringing such person before a magistrate."

cussed above, the Defendant's own testimony establishes that his waiver of *Miranda* rights and subsequent statements were voluntary. Furthermore, the defendants in *Superville* were held for eight days before being presented to a magistrate, substantially longer than the 21 hours between arrest and presentment in this case. Even if this Court were inclined to accept Dimas' invitation to ignore binding Third Circuit precedent—which it is not—the facts here are plainly distinguishable from *Superville*.

█ Finally, Dimas argues that the Government did not prove the reliability of his sworn statement. Dimas cites to *United States v. Martinez–Gaytan*, 213 F.3d 890 (5th Cir.2000), in which the Court of Appeals for the Fifth Circuit held that, where a government agent testifying to a translated confession does not himself speak the language, the government must make the original translator available for cross-examination. *Martinez–Gaytan*, however, emphasized the unique nature of this requirement, "[e]xcept 'in unusual circumstances, an interpreter is no more than a language conduit and therefore his translation does not create an additional level of hearsay.'" *Id.* at 892 (internal citations omitted). Furthermore, the court emphasized that the government agent spoke no English, and distinguished precedents where the translator was not required to appear because the witness, while not fluent, spoke some Spanish. *Id.* Here, Agent Byers did speak some Spanish, having received a certification in Spanish during training for the Border Patrol. Agent Byers testified that the Spanish language translation of the interrogation was correct and that the interpreter correctly read it to Dimas. Given Agent Byers' moderate Spanish language proficiency, the Court finds the Government has provided sufficient evidence to establish the reliability of Dimas' statement. Dimas maintains that neither his statement nor the certification

he signed confirming its authenticity was translated into Spanish for him. He also maintains that Agent Byers was not even present at the interrogation. However, on cross-examination Dimas conceded that he had a poor memory and could not remember whether Agent Burns had gone over his statement with him and the interpreter. Therefore, the Court finds that Dimas was not credible on this issue. Furthermore, Dimas admitted that the interpreter had translated the certification for him. Therefore, Dimas' argument regarding the accuracy of the English translation fails.

## III. Conclusion

Corporal Jaszemski's initial stop of Dimas' vehicle was justified by his concern that he was driving while intoxicated or simply too tired to safely operate the vehicle. During the course of the traffic stop, Corporal Jaszemski made a number of observations that provided reasonable suspicion to expand his inquiry beyond the original scope of the traffic stop. After diligently conducting a proper investigation to confirm his initial suspicion that Dimas was involved in transporting illegal immigrants, Corporal Jaszemski properly took Dimas and his passengers into custody. Upon taking over the investigation, Agent Burns validly obtained a knowing waiver of Dimas' *Miranda* rights and conducted a proper interrogation using a Spanish language interpreter. Accordingly, Dimas' Motion to Suppress will be denied.

An appropriate order follows.

### ORDER

AND NOW, this 11th day of August, 2005, upon consideration of the Defendant's Motion to Suppress Evidence and Statements (Doc. No. 23), it is hereby ORDERED that the Motion is DENIED; it is further ORDERED that jury selection

and trial is scheduled for Wednesday, August 17, 2005, at 9:00 a.m.