**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles CRAIN and Tony Watkins,
Defendants–Appellants.**

No. 93–1331.

United States Court of Appeals,
Fifth Circuit.

Sept. 19, 1994.

Jim Aldridge (Court-appointed), Chappell, Lanehart & Aldridge, P.C., Lubbock, TX, for Crain.

Ronnie L. Agnew (Court-appointed), McWhorter, Cobb & Johnson, L.L.P., Lubbock, TX, for Watkins.

William B. Mateja, Tanya K. Northrup, Asst. U.S. Attys., Richard H. Stephens, U.S. Atty., Lubbock, TX, for appellee.

Before JOHNSON, BARKSDALE and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Defendant-appellants Charles Crain and Tony Watkins were convicted by a jury for conspiracy to possess and possession of cocaine base with the intent to distribute. We affirm Watkins' convictions and sentence on both counts, and we affirm Crain's conspiracy conviction. However, we reverse Crain's possession conviction as not supported by sufficient evidence, and we vacate Crain's sentence and remand his case to the trial court for resentencing.

## FACTS

Because this case involves a challenge to the sufficiency of the evidence, the facts are stated here in detail. Watkins' cousin, Carlos Woodward, testified at trial that on September 12, 1992, in Abilene, Texas, Watkins borrowed Woodward's car to "go pick up his girlfriend." Watkins gave his cousin $60 for the use of the car.

Defendant Crain's cousin, Michael Thompson, was called to the stand at trial by Crain's defense counsel. Thompson testified that on September 12, 1992, Thompson and Crain were at a friend's house in Abilene, and Watkins showed up at about 1 p.m. and asked Crain if he wanted to go to Fort Worth with him. Crain agreed, and Thompson decided to come along, too. The three men, who had known each other all their lives, rode together in the borrowed car and arrived in Fort Worth at about 8 p.m. that evening. They went to the house of Watkins'

girlfriend, Crystal, who was there along with "Buzzy," her roommate. Crain, Thompson, Crystal and Buzzy played dominoes while Watkins made several phone calls. Soon thereafter, Antonio Harris and a person named "Chub" arrived at the house.[1] Watkins, Harris and Chub went outside. After five or ten minutes, Watkins came back inside and said "Man, bull corn. They are tripping, man. Let's go. Are you ready to go? Let's go." Watkins, Crain and Thompson left the house at about 9:30 or 10 p.m., and they went through the drive-through at Taco Bell before heading back to Abilene. They had spent only about two hours in Fort Worth. Crain was driving the car when they started back to Abilene. Watkins was in the front passenger seat, and Thompson rode in the back seat, sleeping part of the time.

Just after midnight on September 13, 1992, Texas Department of Public Safety troopers Jimmy Willey and Steve Tone stopped the car after radar indicated a speed of 90 mph. According to Thompson's testimony, as the car was being pulled over, the three men had a brief conversation. Thompson woke up when he heard Watkins say, "DPS officer." At that point, the patrol car was behind them with its lights flashing. As Crain began to pull over, he said, "The only thing we are going to get is a ticket for speeding." Watkins said, "No, I got this. I got this dope." Thompson said that until that point, he and Crain did not know that Watkins had any drugs with him. Either Crain or Thompson said to Watkins: "Man, that is yours. I don't know nothing about it. You are going to have to deal with that." As Crain was getting out of the car to talk to the officers, he said to Watkins, "Well, hide it or something." While Crain was outside the car

speaking with the DPS troopers, Watkins said to Thompson, "Mike, hide this," and Thompson replied, "I ain't hiding nothing, you got me bent. I ain't gonna touch it. I ain't messing with it." Thompson testified that Watkins then reached over, hid the drugs "up under the seat" on the driver's side, then "set back straight."

DPS troopers Willey and Tone testified that after Crain got out of the car, Trooper Willey asked him to step to the rear of the vehicle and out of traffic. The other two men remained in the car. The trooper asked Crain for his driver's license and proof of insurance. Crain did not have a driver's license with him, but he provided his name and date of birth. When asked about proof of insurance, Crain stated that the car was not his and indicated that the officer should talk to Watkins. The other trooper, Steve Tone, walked up to the front passenger window and asked Watkins for identification and the vehicle's proof of insurance. Watkins supplied both items, obtaining the proof of insurance from the car's glove compartment. At this point, Trooper Tone returned to the patrol car and began running a radio check on both Crain and Watkins, using Watkins' identification and Crain's name and birth date. Meanwhile, Trooper Willey asked Crain where he had been. Crain said that the three men had been in Fort Worth visiting a friend named Antonio Harris. While talking to Watkins about the insurance, Trooper Tone had separately asked Watkins where he had been. Watkins said that they had been to Fort Worth to attend an aunt's funeral. After the radio checks were run on both Watkins and Crain, both troopers returned to the car and confronted Crain about the discrepancy in the stories.[2] Trooper

---

1. Thompson admitted on cross-examination that he, Crain and Watkins all knew before they went to Fort Worth that Antonio Harris was a drug dealer. At one point, Thompson referred to Harris as "Capone."

2. Trooper Tone initially testified that, when confronted with the discrepancy, Crain said the other two "must be lying" because they were scared. During cross-examination of Trooper Tone, however, counsel for Watkins confronted Tone with the videotape of that night, in which Crain does not explicitly state that Watkins was "lying." On the tape, Tone came back around to

Crain and said, "The man in the front seat, what is he afraid of? Well, why did he say that?" and Crain said, "Well, I don't know. There ain't no reason for him to be afraid, you know. He claims—he has got an ID. You can do an ID check on him, too." Tone replied, "Well, why are the stories like that?" At trial, after defense counsel related the exchange on the tape, Tone testified that he "inferred" from that exchange that Crain thought Watkins was lying. Both troopers testified that large portions of the traffic stop videotape were inaudible.

Tone then went and opened the rear door of the car, obtained identification from Thompson, the rear passenger, and asked both Watkins and Thompson if all three men had been to a funeral. Trooper Tone testified that Watkins and Thompson repeated the story that the three of them had been to Watkins' aunt's funeral in Fort Worth.[3] Trooper Tone told them that Crain had said they had been visiting a friend, and that Crain didn't know anything about a funeral. After a few seconds, the two responded that maybe Crain hadn't gone to the funeral with them. During this time, the officers testified, all three men appeared "nervous."

Trooper Tone then asked Crain for consent to "look inside the car," and almost immediately thereafter, Trooper Willey also asked Crain for consent to search the car.[4] The officers did not tell Crain what they were looking for in the search, nor did they ask Crain any questions about possible drugs, weapons or other contraband. Trooper Tone testified at a pretrial suppression hearing that the officers sought consent to search the car for three reasons: (1) the radio check showed that both Crain and Watkins had criminal histories, (2) all three men appeared nervous "like they were trying to hide something," and (3) they had told differing stories about the reason they had gone to Fort Worth. In response to the officers' request for consent to search, Crain hesitated a moment, then repeated that the car did not belong to him. One or both officers told Crain that, as the operator of the car, he could consent to the search. Crain then said something to the effect of "I don't care," "I don't mind," or "go ahead." Although both troopers were aware that Watkins had borrowed the car from a relative and that Watkins had supplied proof of insurance for the car, neither trooper asked Watkins for consent to search the car. Crain was not given a consent form to sign, and he was not informed that he had a right to refuse consent.

Trooper Tone then told Watkins and Thompson to get out of the car because the officers were going to search the passenger compartment. Thompson testified that at that point he did not know that Crain had consented to the search. Watkins and Thompson got out of the car and went to stand at the rear of the car as instructed. Crain remained standing at the rear of the car, where he had been for about 30 minutes since the car was initially stopped. During the search, Trooper Tone found a brown paper bag lodged under the driver's bucket seat, between the seat and the gearshift, underneath the rail by which the seat slides forward and back. The bag had been twisted and rolled up and was "sticking out" two to three inches from underneath the seat. Trooper Tone testified that the bag would have been within easy reach of all three passengers in the car. Tone attempted to remove the bag by pulling it out from the top, but the bag was caught underneath the seat and he could not pull it out from the top without tearing it. Trooper Tone thus removed the bag by pulling it out from under the seat. He then opened the bag and found a plastic bag containing a whitish rock substance that later proved to be crack cocaine base. The government's crime laboratory witness testified that the rock-like substance was 80–percent–pure cocaine base weighing 21.51 grams. FBI Special Agent Tom Clark, testifying for the government, stated that 21 grams of cocaine is worth more than $4,000 on the street, and that possession of such an amount would normally indicate an intent to distribute.

All three men were arrested. Thompson was not charged with any federal violation. Watkins and Crain were both indicted on two counts: (1) conspiracy to possess cocaine base with the intent to distribute; and (2) possession of cocaine base with the intent to distribute.[5] A jury trial was held on February 1, 1993, and the jury found both defen-

---

3. Thompson testified that he did not say they had been to a funeral; he told the trooper only that they had been to Fort Worth.

4. According to Trooper Tone's testimony, by the time Crain was asked for consent to search, the car had been stopped for about 30 minutes.

5. 21 U.S.C. § 841(a)(1); 21 U.S.C. § 841(b)(1)(B)(iii); 21 U.S.C. § 846; 18 U.S.C. § 2.

dants guilty on both counts. The district court held a sentencing hearing on April 2, 1993. Watkins was sentenced to 140 months on each count, to run concurrently. Crain, who had several prior convictions, was sentenced as a "career offender" to 262 months on each count, to run concurrently. Both Watkins and Crain appeal their convictions and sentences.

## ISSUES

Watkins claims that the district court erred in denying his motion to suppress the evidence obtained during the vehicle search.[6] Crain challenges the sufficiency of the evidence to convict him of both the possession offense and the conspiracy offense. Watkins challenges the sufficiency of the evidence to convict him of conspiracy. Both defendants also raise sentencing issues. Crain contends that the district court improperly "double counted" prior convictions when calculating Crain's offense level. Watkins claims that he was improperly denied the opportunity to plea bargain and thus to "accept responsibility" under the Sentencing Guidelines.

## DISCUSSION

*Motion to Suppress Evidence From Search*

Watkins made a pretrial motion to suppress all evidence obtained from the search of the car he had borrowed from his cousin. The motion was denied. On appeal, Watkins makes three arguments as to why the cocaine should have been excluded from evidence:

■ (1) Watkins claims that Crain did not have enough authority over the car to validly consent to the search because Watkins had borrowed the car from his cousin and thus was the only person who had a possessory interest in the car. However, Crain was a co-occupant of the vehicle and had permission to drive it on a late-night highway trip. In such a situation, Watkins had assumed the risk that Crain might consent to a search. *See, e.g., United States v.*

*Richard,* 994 F.2d 244, 250 (5th Cir.1993). A person who has joint control over an automobile may give valid consent to its search. *United States v. Varona–Algos,* 819 F.2d 81, 83 (5th Cir.) (driver's consent to search vehicle valid against passenger who later claimed to be vehicle's owner), *cert. denied,* 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 255 (1987); *see also United States v. Morales,* 861 F.2d 396, 399–400 (3d Cir.1988) (driver had authority to consent to search of vehicle, and search was valid against passenger who had leased vehicle). We therefore conclude that Crain, as the driver of the vehicle with Watkins' permission, had enough authority to consent to the search.

■ (2) Watkins claims that, even if Crain's consent was valid, the troopers exceeded the scope of the consent by opening a closed container inside the car. Watkins argues that because the troopers never stated, or even implied, what they were looking for in the car, the jury could not have reasonably inferred that Crain's general consent would include consent to open a closed paper bag shoved under the seat. However, *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991), states that police do not have to separately request permission to search each closed container in a vehicle, and that the driver's general consent to a search of the car includes consent to examine a paper bag on the floor of the car. *Id.* at 251, 111 S.Ct. at 1803–04. *Jimeno* also notes that the suspect has the right to limit the scope of his consent as he chooses, but in this case, none of the three men attempted to limit the scope of the search. This Circuit, relying on *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803–04, has held that an individual's consent to an officer's request to "look inside" his vehicle is equivalent to general consent to search the vehicle and its contents, including containers such as luggage. *United States v. Rich,* 992 F.2d 502, 508 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 348, 126 L.Ed.2d 312 (1993). We therefore hold that the DPS troopers' search of the paper bag in

6. This issue involves three questions: (1) Did Crain have enough authority over the vehicle to validly consent to the search? (2) Did the troopers, by opening a closed container inside the car, exceed the scope of Crain's consent? (3) Did the investigatory detention violate the Fourth Amendment because it was unreasonably long and intrusive?

this case did not exceed the scope of Crain's consent.

■ (3) Finally, Watkins contends that the investigatory detention violated the Fourth Amendment because it was unreasonably long and intrusive. Under *Terry v. Ohio,* 392 U.S. 1, 9–10, 88 S.Ct. 1868, 1873–74, 20 L.Ed.2d 889 (1968), the issue of whether an investigatory detention or traffic stop complies with the Fourth Amendment depends upon two factors—whether the stop was justified at its inception, and whether the officer's actions during the stop were reasonably related in scope to the circumstances that justified the interference in the first place. *United States v. Shabazz,* 993 F.2d 431, 435 (5th Cir.1993). Watkins concedes that the initial stop for speeding was justified, but he argues that the extended detention and questioning of the occupants about where they had been did not reasonably relate to the speeding violation.

■ We note that other circuits have held or hinted that extensive questioning about matters totally unrelated to the purpose of a routine traffic stop may violate the Fourth Amendment. *See, e.g., United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir. 1988). But this Circuit holds that mere police questioning does not constitute a seizure. *Shabazz,* 993 F.2d at 436. Further, when questioning takes place while officers are waiting for the results of a computer check—and therefore does not extend the *duration* of the stop—the questioning does not violate *Terry. See Shabazz,* 993 F.2d at 437.

In this case, the length of the stop was reasonable. The troopers' questioning of the three men did not lengthen the detention because it occurred while they were still waiting on the computer check. The troopers' conduct therefore was justified under *Shabazz,* 993 F.2d at 435, and the passengers' conflicting stories and nervousness further justified the detention. Therefore, we hold that the trial court's refusal to suppress the evidence gained in the search was not error. *See also United States v. Roberson,* 6 F.3d 1088, 1092 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1322, 127 L.Ed.2d 671 (1994); *United States v. Henao,* 835 F.Supp. 926, 927 (E.D.Tex.1993), *aff'd,* 22 F.3d 1095 (5th Cir.1994) (Table).

*Sufficiency of Evidence as to Watkins—Conspiracy*

■ Although Watkins does not challenge his conviction for possession of cocaine with the intent to distribute, he challenges the sufficiency of the evidence to support his conviction for conspiracy. In a narcotics conspiracy, the government must prove beyond a reasonable doubt that (1) an agreement existed between two or more persons to violate narcotics laws; (2) each alleged conspirator knew of the conspiracy and intended to join it; and (3) each alleged conspirator voluntarily participated in the conspiracy. *United States v. Elwood,* 993 F.2d 1146, 1150 (5th Cir.1993).

When reviewing the sufficiency of evidence, the appellate court views the evidence and the inferences therefrom in a light most favorable to the government and determines whether a rational trier of fact could have found—beyond a reasonable doubt—that the government proved the defendant's guilt on each element of the charged offense. *United States v. Velgar–Vivero,* 8 F.3d 236, 239 (5th Cir.1993), *cert. denied sub. nom., Rivas–Cordova v. United States,* — U.S. —, 114 S.Ct. 1865, 128 L.Ed.2d 486 (1994). With these considerations in mind, we turn to the evidence against Watkins. Watkins paid $60 to borrow the car, initiated the trip to Fort Worth and recruited Crain and Thompson to accompany him. With Watkins' permission, Crain assisted in the driving. Thompson's testimony indicates that Watkins made phone calls, went outside to meet with a known drug dealer, and made the decision of when they would leave Fort Worth. Watkins physically possessed the bag containing the cocaine, made the statement, "I got this dope," and asked for Thompson's help in hiding it. We hold that the evidence was sufficient to support conviction of Watkins for conspiracy, and we therefore AFFIRM that conviction.

*Sufficiency of Evidence as to Crain—Conspiracy*

■ Crain contends that the evidence was insufficient to convince a rational jury of his

guilt beyond a reasonable doubt on either the conspiracy count or the possession count. We first address the evidence on conspiracy.

The government introduced circumstantial evidence tending to prove that Crain knew that Watkins was going to Fort Worth to obtain drugs, and that with this knowledge Crain agreed to accompany Watkins on the trip and help with the driving. The circumstantial evidence of the conspiracy includes these facts: (1) the men drove all the way to Fort Worth, yet stayed there less than two hours, and there was no evidence that any of them thought this was unusual, (2) Crain knew that Antonio Harris was a drug dealer, yet called him a "friend" and told police the three men had gone to Fort Worth to see him, (3) Crain was present when Watkins made several phone calls, then went outside briefly to meet with Harris and "Chub," and (4) Crain contributed to the trip by taking a turn driving.

Although the issue is a close one, we hold that the jury was entitled to infer from these facts that Crain knew of Watkins' illicit reason for going to Fort Worth, yet voluntarily agreed to accompany him and help with the driving. Although Thompson's testimony indicated that Crain did not know about Watkins' intentions, the jury was entitled to discredit that part of the testimony. We therefore AFFIRM Crain's conviction for conspiracy.

### Sufficiency of Evidence as to Crain—Possession

With regard to the possession count, the government must prove beyond a reasonable doubt that Crain (1) possessed illegal drugs; (2) did so knowingly; and (3) intended to distribute the drugs. *Elwood,*

993 F.2d at 1149. Even though we today affirm Crain's conviction for conspiracy, we do not believe that the evidence supports the conclusion that Crain possessed cocaine with the intent to distribute.[7]

Notwithstanding the inferences we must draw in favor of a guilty verdict, we reiterate that the burden of proof in this criminal case was on the government. The government must prove that the defendant was guilty beyond a reasonable doubt, not merely that he could have been guilty. *United States v. Sacerio,* 952 F.2d 860, 863 (5th Cir.1992). In this case, there is no proof that Crain ever had actual possession of the paper bag. On the contrary, there is testimony that Crain never touched the bag, and that as soon as he discovered that it was in the car, he told Watkins, "Man, that is yours ... you are going to have to deal with that."

In an attempt to prove constructive possession, the government emphasizes the fact that the cocaine was found under the driver's seat where Crain had been sitting, and it contends that because Crain was driving the vehicle, he had control over the vehicle and therefore the drugs. However, we have held that when two or more people are occupying a place, a defendant's control over the place is not by itself enough to establish constructive possession of contraband found there. *See United States v. Mergerson,* 4 F.3d 337, 349 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1310, 127 L.Ed.2d 660 (1994). We are especially reluctant to infer constructive possession of contraband by one occupant when there is evidence in the record explicitly linking the contraband to another occupant. *Mergerson,* 4 F.3d at 349 (pawnshop receipt showed that gun belonged to co-occupant of bedroom rather than defen-

---

7. In some cases, a defendant who participates in a conspiracy may be "deemed" guilty of substantive counts, such as possession, committed by a co-conspirator in furtherance of the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 645, 66 S.Ct. 1180, 1183, 90 L.Ed. 1489 (1946); *United States v. Basey,* 816 F.2d 980, 997–98 (5th Cir. 1987). However, a substantive conviction cannot be upheld solely under *Pinkerton* unless the jury was given a *Pinkerton* instruction. *United States v. Sanchez–Sotelo,* 8 F.3d 202, 208 (5th Cir.1993) ("Since the district court did not instruct the jury [under *Pinkerton*], proof of the

conspiracy alone will not sustain the possession charge against Sotelo."), *cert. denied,* —— U.S. ——, 114 S.Ct. 1410, 128 L.Ed.2d 82 (1994); *Basey,* 816 F.2d at 998. *Basey* held that, at a minimum, a proper *Pinkerton* instruction should at least state clearly that the defendant can be convicted of a substantive crime committed by his co-conspirator in furtherance of the conspiracy. *Basey,* 816 F.2d at 998 & n. 35. The jury in this case was not given such an instruction; therefore, Crain's possession conviction must stand or fall on the evidence against Crain. *Sanchez–Sotelo,* 8 F.3d at 208.

dant); *see also United States v. Pigrum*, 922 F.2d 249, 255–56 (5th Cir.), *cert. denied sub. nom. Allen v. United States*, 500 U.S. 936, 111 S.Ct. 2064, 114 L.Ed.2d 468 (1991); *United States v. Onick*, 889 F.2d 1425, 1429–30 (5th Cir.1989) (both reversing possession convictions when evidence linked co-occupant, rather then defendants, to drugs on premises). As we stated in a recent case,

"We recognize that in other cases we have indicated that mere dominion over a vehicle in which [contraband] is found can lead to an inference of constructive possession. But ... while dominion over the vehicle will certainly help the government's case, it alone cannot establish constructive possession of [contraband] found in the vehicle, particularly in the face of evidence that strongly suggests that someone else exercised dominion and control over the [contraband]."

*United States v. Wright*, 24 F.3d 732, 735 (5th Cir.1994) (citations omitted). With regard to Crain, the government did not prove sufficient "circumstantial indicium of possession"—the "something else ... besides mere joint occupancy"—which we require to prove constructive possession. *Mergerson*, 4 F.3d at 349. In addition, "countervailing evidence" links the drugs to Watkins, not Crain: Watkins—not Crain—talked to "Capone" and "Chub." Watkins—not Crain—decided when the three would leave Abilene and when they would depart from Fort Worth. Watkins was the one who announced, "I got this dope," who tried to get Thompson to hide it, and who ultimately stuffed it under Crain's seat. Even if the jurors chose to disbelieve Thompson's testimony, "their disbelief is not tantamount to proof beyond a reasonable doubt" that Crain knowingly possessed cocaine with the intent to distribute it. *See Velgar–Vivero*, 8 F.3d at 241. As in *Velgar–Vivero*, "the jury's conclusion that the government proved [Crain]'s guilt beyond a reasonable doubt was unreasonable as a matter of law." As in *Onick*, 889 F.2d at 1429, we suspect that the jury "must have *speculated* [Crain] into a conviction," piling "inference

upon inference," which it cannot do. Inferences must stop at some point. Even under our strict standard of review for insufficiency claims, we conclude that a rational jury could not have found on this record that Crain was guilty of the possession count. As we stated in a recent case,

"[a]lthough the strict nature of this standard demonstrates our reluctance to interfere with jury verdicts, this case is an example of why courts of appeal must not completely abdicate responsibility for reviewing jury verdicts."

*United States v. Ragan*, 24 F.3d 657, 659 (5th Cir.1994). For the reasons stated, we hold that the evidence was insufficient to convict Crain for possession of cocaine with the intent to distribute.

### *"Double–Counting" in Crain's Sentence*

Crain claims that the trial court erred in overruling his objections to his presentence report. Crain, who was sentenced as a "career offender" under U.S.S.G. § 4B1.1, contends that the sentencing court "double-counted" his prior convictions in setting his base offense level and his criminal history category. However, because we remand Crain's case to the trial court for resentencing in light of this opinion, we do not address the "double-counting" argument.[8]

### *Watkins' Attempt to Plea Bargain*

Before trial, the government offered Crain and Watkins an opportunity to enter into a joint plea agreement. Crain would not agree to plead guilty. The government refused to allow Watkins to plea-bargain individually. Watkins claims that this refusal unjustly denied him the opportunity to accept responsibility for his actions and receive a sentence reduction under U.S.S.G. § 3E1.1. The government counters that there is no constitutional right to a plea bargain, and the prosecutor need not offer a plea bargain if he or she would prefer to go to trial. *Weatherford v. Bursey*, 429 U.S. 545, 560, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977). In addition,

8. In resentencing Crain, the trial court should consider our holding in *United States v. Bellazerius*, 24 F.3d 698, 702 (5th Cir.1994) (vacating defendant's sentence, holding that Sentencing Commission exceeded its authority by including drug conspiracy convictions in list of offenses that trigger career offender status).

we note that Watkins' argument erroneously assumes that there is a cause-and-effect relationship between pleading guilty and receiving the two-point reduction for acceptance of responsibility. The Sentencing Guidelines have expressly rejected that position. The commentary to section 3E1.1 states that a defendant's guilty plea before trial is *evidence* that he or she has accepted responsibility, but a "defendant who enters a guilty plea is not entitled to an adjustment as a matter of right." U.S.S.G. § 3E1.1 commentary n. 3 (1993); *see also United States v. Faubion*, 19 F.3d 226, 229 (1994). In addressing Watkins' claim that he was not allowed to accept responsibility, the probation officer noted that

> "during the interview for the presentence report, Mr. Watkins maintained he was innocent of the instant offenses and signed a statement to that effect.... The defendant's failure to secure a favorable plea agreement before trial does not appear to be relevant to the issue of acceptance of responsibility."

At Watkins' sentencing, the trial court adopted the conclusions and analysis of the PSI, and found "under the record before this court, that the defendant should not be given the credit for acceptance of responsibility under the guidelines." The trial court's decision on this issue is entitled to "great deference." *United States v. Schmeltzer*, 20 F.3d 610, 614 (5th Cir.1994). We hold that the government's refusal to allow Watkins to plea bargain individually does not warrant reversal of his sentence.

## Conclusion

Therefore, we AFFIRM Watkins' convictions and sentence on both counts, and we AFFIRM Crain's conspiracy conviction. We REVERSE Crain's possession conviction as not supported by sufficient evidence, and we VACATE Crain's sentence and REMAND his case to the trial court for resentencing.

9. I disagree with the majority's characterization of Crain's conspiracy conviction as being a "close" issue.

10. According to the Rand McNally Road Atlas, the distance between Fort Worth and Abilene is

**RHESA HAWKINS BARKSDALE,** Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's resolution of all but one issue—its holding that the evidence was not sufficient to convict Crain for possession. The majority describes correctly our narrow and deferential standard of review when confronted with a sufficiency of the evidence challenge: a jury's guilty verdict must be sustained if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (citation omitted; emphasis in original). In attempting to apply this strict standard of review, however, the majority invaded the province of the jury and, instead, elected to weigh the evidence itself.

The evidence supporting Crain's possession conviction was not limited to the single fact that he was the driver of the vehicle in which the drugs were discovered. Maj. op. at 486-87 (quoting *United States v. Wright*, 24 F.3d 732, 735 (5th Cir.1994) ("... while dominion over the vehicle will certainly help the government's case, it alone cannot establish constructive possession of [contraband] found in the vehicle....")). In affirming Crain's conviction for conspiracy, the majority recognized other evidence which proved Crain's constructive possession of the cocaine.[9] For example, it holds that the jury was entitled to infer from the evidence that Crain knew that Watkins was going to Fort Worth to obtain drugs, and that, with this knowledge, Crain agreed to accompany Watkins on the trip and help with the driving. Maj. op. at 486. Additionally, after travelling a great distance, Crain and Watkins spent only about two hours in Fort Worth before commencing their return to Abilene in the late evening.[10] After pulling the car over,

152 miles. Although this fact was never introduced at trial, it is easily within the common experience of a jury sitting in the Northern District of Texas at Abilene.

Trooper Willey initiated contact with the driver, Crain; Trooper Tone's focus was concentrated on the passengers remaining in the vehicle. Trooper Tone testified that during his observation of the other occupants of the car (Watkins and Thompson), he did not see Watkins lean over as if to place something under Crain's seat, as Thompson later testified.[11] Furthermore, the bag of drugs under Crain's seat was not completely hidden—the bag protruded out for two to three inches, clearly within Crain's grasp.

Through Thompson's testimony, Crain may have introduced "countervailing evidence" which tended to link Watkins to the drugs, Maj. op. at 487; however, that evidence does not automatically dissociate Crain from the drugs.[12] For example, the majority does not address the fact that Crain and Watkins could jointly possess the drugs.[13] Most disturbing, however, is its sole reliance upon Thompson's testimony to disregard the evidence which clearly supports the jury's verdict. Thompson testified that after Crain exited the car to talk with the troopers, Watkins placed the drugs under Crain's seat; however, his credibility was seriously questioned.[14] Regardless, it goes without saying that the issue of credibility is for the jury, not this court.

Confronted with this sufficiency of the evidence challenge, the majority fails to adhere to the strict limitation placed upon appellate courts. Instead, it has substituted itself for the jury, electing to weigh the evidence and determine issues of credibility. Because a rational jury could have found Crain guilty of possession beyond a reasonable doubt, I must respectfully dissent from the reversal of his conviction on that charge.

---

**11.** As the majority notes, Thompson was not a defendant. Neither Crain nor Watkins testified.

**12.** In fact, as the majority points out, Thompson was napping on the back seat when the vehicle was stopped. Obviously, while asleep, he could not have heard or understood any conversation Watkins and Crain may have had, to include about drugs.

**13.** The jury instructions made the possibility of joint possession clear: "You may find that the element of possession ... is present if you find beyond a reasonable doubt that the defendants had actual or constructive possession, either alone or *jointly* with others" (emphasis added). As for constructive possession, the instruction provided that "[a] person who, although not in actual possession, knowingly has both the power and the intention, at a given time, to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it."
*Eason v. United States*, 281 F.2d 818, 821 (9th Cir.1960), held "evidence of close friendship,

joint venture and general conduct ... sufficient to warrant a reasonable jury finding beyond reasonable doubt that possession was joint." Subsequent cases suggest that this may be the outer edge for permitting finding possession. *See United States v. Duke*, 423 F.2d 387, 391 n. 3 (5th Cir.1970); *but cf. United States v. Savinovich*, 845 F.2d 834, 837 (9th Cir.) ("if there is a rational basis for attributing interest in the contraband to one party because of relationship with another, a trier of fact can infer sufficient knowledge to support a conviction for possession"), *cert. denied*, 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988). These factors are present here, but, in the light of the other evidence, are not necessary to consider in resolving this issue.

**14.** Besides being related to Crain, Thompson had an extensive criminal record, and, when initially interviewed by the troopers, failed to mention that Watkins originally possessed the drugs and then placed them under Crain's seat.