*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2013 UT 9**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Plaintiff and Appellee,*

*v.*

ALAN L. CHETTERO,
*Defendant and Appellant.*

No. 20110667
Filed February 15, 2013

Third District, Silver Summit
The Honorable Bruce C. Lubeck
No. 081500301

Attorneys:
John Swallow, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen.,
Salt Lake City, David R. Brickey, Paul R. Christensen, Park City,
for appellee

Gerry D'Elia, Park City, for appellant

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT and JUSTICE PARRISH joined.

ASSOCIATE CHIEF JUSTICE NEHRING filed an opinion concurring and
dissenting in part, in which JUSTICE DURHAM joined.

JUSTICE LEE, opinion of the Court:

¶1   In mid-November 2008, the Utah Highway Patrol (UHP)
performed a drug interdiction exercise on a rural stretch of I-80 in
Summit County. Most of the cars stopped during the exercise, in-
cluding one driven by Alan L. Chettero, were licensed in other
states. Chettero's traffic stop yielded evidence of illegal drugs (105
pounds of marijuana), which Chettero sought to suppress during
his subsequent prosecution for possession with intent to distri-
bute. Chettero filed two suppression motions—one based on the
Equal Protection Clause and right to travel, and the other rooted

in the Fourth Amendment. The district court denied both. Chettero then entered a conditional guilty plea. He now appeals.

¶2   We affirm. The traffic stop Chettero complains of did not restrict his movement in a manner implicating his fundamental right to travel. His equal protection claim is equally meritless: There was a rational basis for UHP's choice to focus the bulk of its enforcement efforts on cars bearing out-of-state license plates given UHP's understanding that significant quantities of drugs would be transported from California through Utah during mid-November. Finally, to the extent the district court erred in failing to consider any evidence of relevance to the Fourth Amendment motion to suppress, it is excusable as harmless error.

I

¶3   UHP's interdiction exercise took place November 14-16, 2008. The exercise was designed to "prevent accidents, while removing criminals, drug proceeds, and controlled substances from [Utah] highways." Its timing was prompted by California law enforcement communications, which indicated that the marijuana harvest in California ended in late October and that marijuana would likely be ready for transport eastward in mid-November. UHP hoped to intercept some of this illegal traffic. To do so, it made high-volume traffic stops on a stretch of I-80 in eastern Summit County between Kimball Junction and the Wyoming border.

¶4   Most vehicles stopped were licensed outside Utah. According to Summit County dispatch tapes, 147 vehicles were stopped during the exercise, and all but one (99.3 percent) bore out-of-state plates. The troopers' daily logs show slightly different numbers. These logs reveal that of the 144 stops made, 136 (95 percent) involved out-of-state plates. Despite these statistics, the state maintains that troopers were not instructed to target out-of-state vehicles.

¶5   In one of the twenty-three stops Trooper Jensen made during the exercise—all of which involved cars with out-of-state plates—he stopped Alan Chettero's California-plated vehicle.[1]

---

[1] This stop occurred at 9:30 p.m. on November 13, 2008. Although this raises the question whether Chettero was stopped during the course of the interdiction exercise (which ran from No-

Jensen asserts that he stopped Chettero because he crossed the fog line three times in a one-half-mile stretch. Upon approaching Chettero's car after making the stop, Jensen noticed that the rear compartment of the vehicle was completely filled with something covered by a blanket. As Jensen spoke with Chettero through the open front window, he noticed a strong odor of raw marijuana. Jensen then searched the vehicle, finding 105 pounds of marijuana.

¶6   Chettero was arrested and charged with possession of marijuana with intent to distribute. He filed two motions to suppress the evidence seized during the stop and/or to dismiss the information filed against him.

¶7   In the first motion, he argued that UHP's selective enforcement of the traffic laws had impermissibly infringed on his right to travel and violated his equal protection rights. The court held oral argument on the motion, and then denied it in a written order. In the order, the court concluded that Chettero had failed to prove that the traffic laws had been selectively enforced against him, noting that a selective enforcement claim requires proof of both discriminatory effect and discriminatory purpose. The court found Chettero had shown the former but not the latter, indicating that he had failed to show an "improper motivation" underlying the stops.

¶8   After the case had been transferred to a different judge, Chettero filed an additional motion to suppress. This motion—based on the Fourth Amendment—claimed that Trooper Jensen had fabricated the basis for the traffic stop. The district court held oral argument on the motion, and the State advanced two main pieces of evidence to prove there was an adequate basis for the stop—testimony by Trooper Jensen and a videotape showing the actual traffic stop (but not the offense precipitating it).

¶9   Trooper Jensen testified at the hearing that Chettero was stopped as part of an interdiction exercise. Chettero's counsel asked him whether the "primary goal" of the exercise was to "interdict marijuana for out-of-state plate vehicles." Jensen responded, "[n]o." Chettero's counsel then asked him what the purpose of

---

vember 14-16), the State concedes that he was, and we accordingly assume that fact.

the exercise was, to which Jensen responded, "[m]ake high volume traffic stops." Chettero's counsel queried, "[h]igh volume of out-of-state traffic stops?" Jensen answered, "[n]ot specifically out of state."

¶10 Following this exchange, Chettero's counsel tried to impeach Jensen's testimony with statistical evidence showing that mostly out-of-state plated vehicles had been stopped. The district judge sustained a relevance objection to the admission of this evidence. Chettero's counsel challenged this ruling, indicating that he would like to submit a supplemental memorandum explaining how this evidence was relevant. The judge responded that he was "willing to let [him] have additional time . . . to submit a memorandum based upon what's happened here today." Ultimately, after conferring with Chettero, counsel declined this opportunity. The court then denied the motion to suppress, basing its ruling on both the "testimony of . . . officer [Jensen] and reviewing the videotape."

¶11 After both of his motions were denied, Chettero entered a conditional guilty plea, reserving the right to appeal the issues raised in his motions. Chettero was then sentenced to a suspended term of one to fifteen years, and was placed on probation for eighteen months. He then filed this appeal.

II

¶12 Chettero contends that the district court made two primary errors in denying his motions to suppress. First, in considering his equal protection/right to travel motion, Chettero asserts that the court wrongly concluded that he had not proved discriminatory enforcement of Utah's traffic laws. Second, in considering his Fourth Amendment motion, Chettero insists that the district court failed to consider relevant statistical evidence. We find both arguments unpersuasive and accordingly affirm.

A

¶13 Chettero's first motion to suppress was based on the claim that it was constitutionally impermissible for the highway patrol to selectively enforce the traffic laws against those driving cars bearing out-of-state license plates. Chettero supported this assertion with two related, but distinct, arguments, one based on the constitutional right to travel, and the other on the Equal Protection Clause. The district court rejected both arguments after con-

cluding that Chettero had failed to show that the traffic laws had been selectively enforced against him at all. We affirm, albeit on slightly different grounds—that his right to travel and equal protection claims are meritless, even assuming he proved selective enforcement of the traffic laws.

1

¶14 We find no basis for a conclusion that the UHP interdiction violated Chettero's constitutional right to travel. The mere assertion of disparate treatment of out-of-state vehicles is insufficient. For the constitutional right to travel to be implicated, Chettero would have to establish that such disparate treatment infringed on his fundamental constitutional rights. And that is a showing he cannot make.

¶15 Under U.S. Supreme Court precedent, the right to travel is understood to comprise three components: (1) "the right to go from one place to another," by using "highway facilities and other instrumentalities of interstate commerce," which "includ[es] the right to cross state borders while en route"; (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State"; and (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *See Saenz v. Roe*, 526 U.S. 489, 500–01 (1999) (internal quotation marks omitted).

¶16 At oral argument, Chettero's counsel clarified that his claim was rooted solely in the second component of the right to travel.[2]

---

[2] Counsel's waiver of the first component might seem puzzling at first blush, given that Chettero sought to traverse Utah using its interstate highways and the traffic stop arguably restricted his freedom to do so. On reflection, however, the waiver of this component seems necessitated by the case law, which limits the reach of this component to cases involving significant impediments on the right to freely traverse a state—impediments beyond the mere threat of a traffic stop for a violation of the traffic laws. *See, e.g.,* *Edwards v. California*, 314 U.S. 160, 174, 177 (1941) (striking down a law that criminalized bringing an entire class of persons [indigents] into California); *see also Maryland State Conference of NAACP Branches v. Maryland Dep't of State Police*, 72 F. Supp. 2d 560, 568–

But this second component was not implicated by the traffic stop in question.

¶17 The second component of the right to travel is rooted in Article IV, Section 2 of the United States Constitution, which entitles citizens of "each State" to "all Privileges and Immunities of Citizens in the several states." *See Saenz*, 526 U.S. at 501 (internal quotation marks omitted). A review of the cases cited in *Saenz* in support of this component of the right to travel indicates that it protects only the rights of non-residents to exercise fundamental economic rights (e.g., obtaining employment or commercial licenses) or to seek important services (such as medical services).[3] *See id.* at 501–02 (citing cases). And even in circumstances involving one of these substantial rights, the second component of the right to travel does not foreclose all discrimination against non-residents. *See id.* It bars only "discrimination . . . where there is no substantial reason for the discrimination beyond the mere fact that [individuals] are citizens of other States." *Id.* (internal quotation marks omitted).

¶18 Chettero's right to travel claim cannot succeed under these standards. Here there is no allegation of any withholding of access to fundamental economic rights or essential services in Utah. Nor is there any indication of discrimination based on the mere fact of citizenship in another state. To the extent there was discrimination, it was based on intelligence that suggested marijuana would be transported from California (where it was grown) across Utah on its way east. So any differential treatment was not based on the "mere fact" that Chettero was a citizen of another state, and the right to travel was not implicated even assuming some form of discrimination.

---

69 (D. Md. 1999) (observing that a mere traffic stop probably does not implicate the first component of the right to travel).

[3] This is consistent with the U.S. Supreme Court's pronouncement that the Privileges and Immunities Clause applies only to rights that "bear[] on the vitality of the Nation as a single entity" and are "sufficiently basic to the livelihood of the Nation." *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 64 (1988) (internal quotation marks omitted).

¶19 Chettero's parallel claim of selective enforcement of the traffic laws in violation of the Equal Protection Clause fails on similar grounds. The charge of discrimination on the basis of driving an out-of-state vehicle misses a key point: Selective enforcement alone is insufficient to prevail on equal protection grounds, as most "targeting" is simply not prohibited by the Equal Protection Clause.

¶20 Classifications are regularly made in the creation and enforcement of the law. Most such classifications are permissible, and thus are subject only to minimal scrutiny under the Equal Protection Clause (i.e., rational basis review). *See State v. Robinson*, 2011 UT 30, ¶ 22, 254 P.3d 183 (explaining that "rational basis" scrutiny is applied unless a "fundamental right or suspect class [is] at issue"). Only a handful of classifications are so generally problematic (and so unlikely reasonable) that they trigger heightened scrutiny. Such problematic classifications include race[4] and gender.[5]

¶21 Chettero, however, has not alleged that the traffic laws were selectively enforced on the basis of any judicial-scrutiny-heightening classification. He asserts only that those driving Utah-licensed vehicles were treated differently than those driving vehicles licensed elsewhere. His equal protection claim is thus subject to mere rational basis review.

¶22 And his equal protection claim fails under this standard. Rational basis scrutiny requires only that a classification bear some conceivable relation to a legitimate government purpose or goal. *See L.C. Canyon Partners, L.L.C. v. Salt Lake Cnty.*, 2011 UT 63, ¶ 12 n.2, 266 P.3d 797 (explaining the wide degree of discretion

---

[4] *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) ("[R]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." (internal quotation marks omitted)).

[5] *See United States v. Virginia*, 518 U.S. 515, 531 (1996) ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action.").

afforded under rational basis review).[6] This "conceivable relation" standard does not require documentary evidence or other actual proof to sustain a classification. *See F.C.C. v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313–15 (1993) (explaining that classifications "may be based on rational speculation unsupported by evidence or empirical data" because classifications "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification"). After all, "the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that" the classification selected is a "rational way to correct it," even if it "exact[s] a needless, wasteful requirement." *Williamson v. Lee Optical of Okla.,* 348 U.S. 483, 487–88 (1955).

¶23 Preventing drug trafficking across a state is at least a legitimate goal. *See United States v. Place,* 462 U.S. 696, 703 (1983) ("[T]he public has a *compelling* interest in detecting those who would traffic in deadly drugs for personal profit." (emphasis added) (internal quotation marks omitted)). And UHP had every reason to believe that high-volume traffic stops conducted in the middle of November would help it achieve this goal. After all, UHP had been in communication with California law enforcement authorities, and these authorities had informed UHP that because of the marijuana harvest in late October, drug trafficking from California eastward was most likely to occur during November. Moreover, it was certainly conceivable that individuals in cars bearing plates from other states were more likely to be passing through the state (as opposed to going from Point A to Point B within the state) and thus were more likely to be transporting

---

[6] *See also State v. Robinson,* 2011 UT 30, ¶ 24, 254 P.3d 183 (explaining that classifications are sustained under rational basis review "if we can reasonably conceive of facts which would justify the distinctions" (internal quotation marks omitted)); *Ry. Express Agency, Inc. v. New York,* 336 U.S. 106, 110 (1949) ("It is no requirement of equal protection that all evils of the same genus be eradicated or none at all."); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 539–40 (1942) (explaining that the Equal Protection Clause does not require "abstract symmetry" (internal quotation marks omitted)).

some of these drugs. And, as noted, mere conceivability that those driving vehicles licensed outside the state were more likely to be transporting drugs is all that the Equal Protection Clause demands. We thus reject Chettero's contrary assertion that UHP needed concrete documentary proof to sustain its classification.

¶24 In these circumstances, making high volume traffic stops focusing on out-of-state licensed vehicles had a conceivable relation to UHP's legitimate goal of intercepting drug traffic across the state. Chettero's equal protection claim accordingly fails as there is an ample rational basis for any discrimination engaged in by the state.

B

¶25 Chettero's second motion to suppress was rooted in the Fourth Amendment. In challenging the denial of this motion, Chettero contends that the district court erred in excluding relevant evidence at the hearing on this motion. The hearing centered on Chettero's assertion that Trooper Jensen had fabricated the basis for his traffic stop. In support of that charge, Chettero sought to admit statistical evidence showing that the vast majority of cars stopped by UHP during the course of the interdiction exercise bore out-of-state license plates, claiming this statistical evidence impeached Trooper Jensen's credibility because Jensen had allegedly denied that the primary goal of the interdiction exercise was to target out-of-state individuals.

¶26 We affirm the denial of this motion to suppress. Although the district court may have misapprehended Chettero's argument, two key considerations convince us that there was either no error at all or that any error was harmless.[7]

1

¶27 First, it is not at all clear that the statistical evidence Chettero advanced would have impacted Trooper Jensen's credibility, and Chettero affirmatively waived the opportunity that the dis-

---

[7] *See H.U.F. v. W.P.W.*, 2009 UT 10, ¶ 44, 203 P.3d 943 ("[H]armless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings." (alteration in original) (internal quotation marks omitted)).

trict court provided him to show how it might have. After all, Trooper Jensen never indicated that there was no ongoing interdiction campaign at the time of the Chettero stop. Nor did Jensen ever deny stopping more cars from out of state (which is what the statistical evidence Chettero advanced would have shown). Rather, Jensen noted only that the purpose of the exercise was not "specifically" to stop those from out of state.

¶28 In context, Jensen might reasonably have been insisting only that the subjective purpose of the exercise was to stop those likely to be carrying drugs (and not generally to stop those from out of state). And presumably that was the specific purpose of the interdiction. With this in mind, the statistical evidence Chettero sought to introduce would not obviously have contradicted Trooper Jensen's testimony or undermined his credibility.[8]

¶29 And in any event, Chettero's counsel waived the express opportunity afforded by the district court to show that it did. After Trooper Jensen's testimony, and before the court ruled on Chettero's motion, the court gave him the opportunity to submit "a memorandum *based upon what's happened here today.*" Chettero's counsel declined this opportunity after conferring with Chettero. If Chettero wished to preserve an objection to the trial court's failure to consider the relevant statistical evidence, he should have availed himself of this opportunity. Submitting the memorandum would have allowed Chettero to specifically explain just how the statistical evidence affected Trooper Jensen's credibility, based upon the testimony Jensen actually gave at the hearing. This

---

[8] The dissent claims that Trooper Jensen's testimony "makes clear that the officer [was] saying under oath that the purpose of the exercise was to stop everyone, not to focus on out-of-state plates." *Infra* ¶ 36. But as the full hearing colloquy reveals, *infra* ¶ 34, Trooper Jensen never clearly manifested such a purpose. Trooper Jensen's general statement that the purpose of the exercise was to "[m]ake high-volume traffic stops" simply does not indicate an answer to the more nuanced question of which individuals would be targeted in making those stops. And when asked that more nuanced question specifically, Trooper Jensen never denied that he may have stopped more individuals driving vehicles licensed outside of Utah. Rather, he merely denied that doing so was the "specific[]" purpose of the interdiction exercise.

showing was one that Chettero had not made previously,[9] and that he never made at the suppression hearing itself.

¶30 Rather, at the hearing he did no more than generally assert that the statistical evidence was relevant to Trooper Jensen's credibility in the abstract, noting that "the more evidence that there is that the officer stopped these vehicles and that his mission was to search these vehicles for marijuana coming from out-of-state that goes to the officer's credibility." But this general assertion was only true to the extent that Trooper Jensen's testimony actually indicated he had some other "mission" at the time of the stop. And for the reasons already noted, it was less than clear that his testimony did so. Chettero's supplemental brief could have offered such a showing. His failure to do so forecloses his argument on appeal.

---

[9] Chettero raised a related argument in his earlier memorandum in support of the motion to suppress. This memorandum had referenced *State v. Lopez*, 873 P.2d 1127 (Utah 1994), in asserting that evidence indicating that a police detention is motivated by suspicions unrelated to the traffic offense makes an officer's assertion that the offense occurred less credible. But this general argument was not the same as the specific one that the trial judge gave Chettero the opportunity to make, and certainly is not a basis to determine that he did not waive expounding on his theory regarding Trooper Jensen's testimony. Until the suppression hearing, after all, Chettero did not know what Trooper Jensen would say about the purpose underlying the traffic stop. The dissent fails to grasp this point in suggesting that the initial memorandum was sufficient. *Infra* ¶ 37. This memorandum did not (and could not) give the trial court the opportunity to rule on the *specific* argument that the statements made by Trooper Jensen at the suppression hearing were *actually* contradicted by the statistics. And it was this specific issue that the supplemental memorandum would have allowed Chettero to raise. An initial memorandum that, by the dissent's admission, "speaks in generalities," cannot be said to have specifically preserved this more nuanced argument. *Infra* ¶ 37.

2

¶31 Further, even if the statistical evidence had clearly borne on Trooper Jensen's credibility, the district court's ruling denying Chettero's motion to suppress was not based *solely* on Jensen's testimony. Rather, in ruling on the motion, the district court also relied in part on the videotape of the stop.[10] And although the videotape did not show the traffic violation leading to the stop, it did show the actual stop. Apparently, moreover, the videotape corroborated portions of Trooper Jensen's testimony related to the stop, including the fact that Chettero had crossed the fog line again as he was being pulled over, straddling it for quite a distance until his vehicle came to rest at a stop sign at the bottom of the ramp.[11] It also appears to have discredited portions of Chettero's testimony, including his assertion that Trooper Jensen was a mere half-car-length away when he made the stop.

¶32 Significantly, though, this video was not included in the record on appeal. And "[w]hen crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court." *State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278 (internal quotation marks omitted). Thus, even if it was error to not consider the statistical evidence, Chettero still cannot show that this error was prejudicial, given that the judge also based his ruling on the video evidence, which was not included in the appellate record.[12] Consequently, we conclude that the trial court's

---

[10] In particular, the court noted that "based upon what I have heard here, based upon the testimony of the officer *and reviewing the videotape*, I believe that there's probable cause to stop." (Emphasis added.)

[11] Trooper Jensen's testimony had indicated his observation that "as the vehicle was taking the offramp, [Chettero] crossed the fog line again and straddled the fog line with the vehicle until coming to a stop at a stop sign," and that this was something that caused him "further concern" as the "vehicle came to a stop."

[12] The dissent finds fault with this analysis based on its suggestion that there was "nothing critical about the video" because it did not show the Chettero traffic infraction and was accordingly "not relevant to the question of whether the officer

exclusion of the statistical evidence was, at most, harmless error, and affirm the denial of his second motion to suppress.

––––––––––––––––

ASSOCIATE CHIEF JUSTICE NEHRING, concurring and dissenting in part:

¶33    I concur in the court's equal protection analysis and agree with the judgment of the court that the traffic stop of Mr. Chettero did not infringe his right to travel.   However, the majority explains that any discrimination in this case "was based on intelligence that suggested marijuana would be transported from California (where it was grown) across Utah . . . [s]o any differential treatment was not based on the 'mere fact' that Chettero was a citizen of another state."[1]   The only information that animated law enforcement to make the high volume of traffic stops that included Mr. Chettero was that marijuana could come from out of state.   Had troopers stopped cars based on the mere

––––––––––––––––

had reasonable suspicion to seize Mr. Chettero when he activated his lights and initiated the stop." *Infra* ¶ 38.  But while it is true that the video does not show the Chettero infraction—a point already made clear above, *supra* ¶ 31—the video is nonetheless significant.  This significance follows from the fact, acknowledged by the dissent, that Chettero's suppression motion was, "like most suppression motions, . . . a credibility contest." *Infra* ¶ 34.  The video evidence bore on the issue of credibility by, apparently, both corroborating Trooper Jensen's account of the stop and discrediting portions of Chettero's account.  *Supra* ¶ 31.  But because this video evidence was not included in the appellate record, Chettero cannot bear his burden of showing that the exclusion of the statistical evidence he sought to introduce— which also bore on credibility—was prejudicial error warranting reversal.  After all, the videotape could have been sufficient to independently convince the trial court that, in this "credibility contest," Jensen was telling the truth and Chettero was not.  And in the absence of its inclusion in the appellate record, we have no choice but to presume that it supports the trial court's conclusion that Trooper Jensen was the winner of the "credibility contest," *infra* ¶ 34, such that the trial court's ultimate denial of suppression was proper.

[1] *Supra* ¶ 18.

fact of bearing foreign license plates, their activities would have been more suspect. Still, Justice Lee's analytic approach, when examined more closely, actually concedes the "mere fact" point. The troopers were after drugs. They had received word that the bounty of the California marijuana harvest was coming this way and decided to do something about it. During the interdiction exercise, 95–99 percent of all the cars stopped, and all twenty-three of the cars stopped by the trooper in question, were from out of state.[2] Whatever else might be said about the trooper's motives, it is safe to say they were not responding to an epidemic of motorists crossing the fog line. Based on what law enforcement knew, out-of-state marijuana was transiting Utah, transported in vehicles bearing out-of-state license plates. A foreign license plate was not one of several reasons given for stopping cars, it was the only reason. Was it unconstitutional? No. The stops were supported by a rational basis and affected lesser interests than those targeted in right to travel cases.

¶34    I am troubled by the court's analysis in Part II.B. and for the reasons set out below, cannot join it. Mr. Chettero pressed his Fourth Amendment claim after the court rejected his right to travel and equal protection arguments. His suppression motion was heard by a new judge and, like most suppression motions, it was a credibility contest. The following exchange captures the flavor of testimony concerning the purpose of the stops.

> Q:   And wasn't the primary goal to interdict marijuana for out-of-state plate vehicles?
>
> A:   No.
>
> Q:   What was the purpose of it?
>
> A:   Make high volumes traffic stops.
>
> Q:   High volumes traffic stops?
>
> A:   Yes.
>
> Q:   High volumes of out-of-state traffic stops?
>
> A:   Not specifically out-of-state.
>
> Q:   Do you know what the statistics are? Because we have it in evidence in this case already for how

---

[2] *Supra* ¶¶ 4–5.

> many you stopped for out of state people versus in-state.

> MR. BRICKEY: Objection. Irrelevance.

> THE COURT: Sustained. That's already been addressed . . . by the court, then ruled on by the court.

> MR. D'ELIA: Oh, absolutely. I'll move on. And, again, I was only getting into the credibility of the officer and what this officer would say on the stand today versus what the court did find.

During argument before the district court, Mr. Chettero's counsel again mentioned the statistics, specifically reading from a memorandum filed with the court before the hearing that cited *State v. Lopez*:

> [A]n officer's subjective suspicions unrelated to the traffic violation for which he or she stops a defendant can be used by defense counsel to show that the officer fabricated the violation. The more evidence that detention was motivated by police suspicions unrelated to the traffic offense, the less credible the officer's assertion that the traffic offense occurred.[3]

The court responded that it is constitutionally acceptable to target out-of-state cars. The majority acknowledges that the court "may have misapprehended Chettero's argument,"[4] possibly confusing it with his right to travel and equal protection arguments.

¶35 The statistical evidence was both relevant and admissible for impeachment purposes, and the trial court abused its discretion when it rejected it. The lead opinion asserts that there "was either no error at all or that any error was harmless" in excluding the evidence because the evidence might not have impacted Trooper Jensen's credibility "and Chettero affirmatively waived the opportunity that the district court provided him to show how it might have."[5]

¶36 First, the majority states that Trooper Jensen was only suggesting that the purpose of the exercise "was not 'specifically'

---

[3] 873 P.2d 1127, 1138–39 (Utah 1994) (citation omitted).

[4] *Supra* ¶ 26.

[5] *Supra* ¶¶ 26, 27.

to stop those from out of state."[6]  "In context," he was only insisting that the subjective purpose of the exercise was to stop those carrying drugs, not generally to stop everyone from out of state.[7]  But the *only* suggested method for how to find drugs the majority mentions is to stop high volumes of cars and to target cars registered in another state.  And the testimony quoted above makes clear that the officer is saying under oath that the purpose of the exercise was to stop everyone, not to focus on out-of-state plates.  The statistics would have been relevant to impeach this remark.

¶37  Next, the majority asserts that Mr. Chettero waived the argument because, after making it to the court, he conferred with his attorney and declined to file an additional memorandum.  The memorandum would necessarily have been based on authority already before the judge, primarily *State v. Lopez*, after the judge had made his ruling clear.  An argument is preserved if a party has presented it to the district court in such a way that the court had an opportunity to rule on it.  "In determining whether the district court had an opportunity to rule on an issue, a court considers three factors:  (1) whether the issue was raised in a timely fashion, (2) whether the issue was specifically raised, and (3) whether supporting evidence or relevant authority was introduced."[8]  The district court here had an opportunity to rule on this issue.  It was raised in a timely fashion, it was raised specifically, and it included the same authority Mr. Chettero uses on appeal.  The judge gave Mr. Chettero an opportunity to file a memorandum that would have made these same arguments and he declined, possibly in order to save all parties involved time and resources on a case he already anticipated appealing.  Justice Lee states that the argument in the motion citing *Lopez* "was not the same as the specific [argument] that the trial judge gave Chettero the opportunity to make" because "[u]ntil the suppression hearing . . . Chettero did not know what Trooper Jensen would say about the purpose underlying the traffic stop."[9]  The memorandum speaks in generalities, but it clearly anticipates that

---

[6] *Supra* ¶ 27.

[7] *Supra* ¶ 28.

[8] *Winward v. State*, 2012 UT 85, ¶ 9, _ P.3d _ (internal quotation marks omitted).

[9] *Supra* ¶ 29 n.9.

the officer will fabricate a reason for the stop. And in any event, counsel coherently made the argument that he repeats on appeal at the suppression hearing, citing controlling authority, and received a ruling on it. More should not be required for preservation.

¶38 Next, the majority opinion states that the court's error was harmless because it also based its decision on a videotape. The video was not included in the record on appeal and "[w]hen crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court."[10] But there was nothing critical about the video. Both parties agree that the video does not start until "right at the point [the officer] activate[ed] the overheads." The "driving pattern that [the officer] described is not on [the] video." The purpose of the suppression hearing was to determine whether the officer had reasonable suspicion to initiate the stop. Once the lights were activated, the detention was initiated. "[A]ny reasonable driver would understand a flashing police light to be an order to pull over, although the Supreme Court has said that such an order would not give rise to a 'stop' unless the driver submitted to the order or was physically apprehended."[11] Here, Mr. Chettero did

---

[10] *Supra* ¶ 32 (alteration in original) (quoting *State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278).

[11] *United States v. Swindle*, 407 F.3d 562, 566 (2d Cir. 2005). *Swindle* involved a defendant who did not yield, and therefore was not seized. It begins its analysis by discussing the importance of reasonable suspicion at initiation: "While not explicitly addressing the point from which reasonable suspicion must be measured, other courts have emphasized that a stop must be justified at its inception." *Id.* at 567. The Second Circuit in that case cites *Feathers v. Aey*, 319 F.3d 843, 848–49 (6th Cir. 2003) ("The question is whether, at the moment that they initiated the stop, the totality of the circumstances provided the officers with the reasonable suspicion required in order to detain a citizen under *Terry*."); *United States v. Finke*, 85 F.3d 1275, 1279 (7th Cir. 1996) ("Under *Terry* the stop must be justified at its inception . . . ."); *United States v. Crain*, 33 F.3d 480, 485 (5th Cir. 1994) ("[T]he issue of whether an investigatory detention or traffic stop complies with the Fourth Amendment depends [in part] upon . . . whether the stop was justified at its inception."); and *United States v. Walker*, 933 F.2d 812, 815 (10th Cir. 1991) (in support of the proposition

submit to the show of authority.  The videotape showed what happened after that:    Mr. Chettero pulled over and was apprehended because the officer smelled the large amount of drugs in his car.  This is not relevant to the question of whether the officer had reasonable suspicion to seize Mr. Chettero when he activated his lights and initiated the stop.  That the video may have offered some support to the officer's testimony is not enough to render the error that occurred at the hearing harmless.

¶39   "An error is harmful if it undermines our confidence in the verdict; if, minus the error, there is a sufficiently high likelihood of a different outcome."[12]  When the court must decide which of two witnesses is telling the truth and has improperly excluded evidence that goes to credibility, the error is not harmless.   I would reverse the trial court and remand for additional proceedings concerning the legitimacy of the stop.

_____

that to uphold a *Terry* stop, a court must determine "whether the officer's action was justified at its inception" (internal quotation marks omitted)).

[12] *State v. Arguelles*, 2003 UT 1, ¶ 94, 63 P.3d 731 (internal quotation marks omitted).